UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DISABILITY RIGHTS NEW YORK,
EVAN THOMAS,

                                    Plaintiffs,

                                                                    **REPORT AND**
                                                                    **RECOMMENDATION**
             -against-                                              17-CV-6965-RRM-SJB

NEW YORK STATE,
ANDREW CUOMO,
        *in his official capacity*,
OFFICE FOR PEOPLE WITH DEVELOPMENTAL
        DISABILITIES,
KERRY A. DELANEY,
        *in her official capacity*,

                                    Defendants.
-------------------------------------------------------------X

**BULSARA, United States Magistrate Judge:**

Plaintiff Disability Rights New York ("DRNY") commenced this action against

New York State, Governor Andrew Cuomo ("Cuomo"), the Office for People with

Developmental Disabilities ("OPWDD"), and its Acting Commissioner Kerry A. Delaney

("Delaney") (collectively, "Defendants") on November 30, 2017 alleging violations of

Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the

Rehabilitation Act ("Rehab Act").  (Compl. dated Nov. 30, 2017, Dkt. No. 1).  On June 6,

2018, DRNY filed an Amended Complaint, adding Evan Thomas ("Thomas") as an

individual Plaintiff for putative class action claims on behalf of others similarly situated.

(Am. Compl. dated June 6, 2018, Dkt. No. 28).

In broad strokes, the Amended Complaint alleges that Defendants have failed to

timely discharge adults with disabilities from residential schools where they currently

live to a more integrated community setting.  (*Id.* ¶¶ 2-7).  DRNY brought this suit on

behalf of 300 adults—referred to in the Amended Complaint as Adults Awaiting

Discharge—who do not oppose placement in a more integrated environment. (*Id.* ¶ 21).

Defendants have moved to dismiss, asserting that, among other things, DRNY and

Thomas lack standing to bring such claims. (Mot. to Dismiss filed Dec. 13, 2018, Dkt.

No. 39 ("Defs.' Mot.") at 1). DRNY is New York State's Protection and Advocacy

system—that is, it is designated by the State to "litigate claims of abuse, neglect, and

rights violations on behalf of individuals with disabilities," (Am. Compl. ¶¶ 14, 21).

DRNY argues that, because of this statute, it has standing to bring lawsuits on behalf of

disabled persons in New York, whether or not the individual has consented to suit or

joined the litigation. (Pls.' Mem. of Law in Opp'n filed Dec. 13, 2018, Dkt. No. 42 ("Pls.'

Mem.") at 9). For the reasons discussed below, the Court concludes that DRNY's broad

view of its standing is incorrect. However, the individual Plaintiff, Evan Thomas, has

standing, and his lawsuit may proceed. As such, the Court recommends the motion to

dismiss be granted in part and denied in part.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

DRNY is an organization "authorized to pursue legal, administrative and other

appropriate remedies . . . to ensure the protection of, and advocacy for, the rights of

individuals with disabilities" in New York State. (Am. Compl. ¶ 19). DRNY operated

formerly under the name Disability Advocates Incorporated ("DAI"), from 1989 to 2013,

and as a contractor for the State's Commission on Quality Care ("CQC"). (*Id.* ¶¶ 15-16).

CQC was previously New York's Protection and Advocacy ("P&A") system from 1976 to

2013. (*Id.* ¶ 15). The federal Developmental Disabilities Assistance and Bill of Rights

Act ("DD Act") requires states to establish P&A systems in order to receive federal

funding. (*Id.* ¶ 14); *see* 42 U.S.C. § 15041 *et seq.* In May of 2013, DAI was appointed by

Cuomo to replace CQC as New York's P&A system, and it changed its name to DRNY. (*Id.* ¶¶ 17-18).

DRNY brought this suit on behalf of adults with disabilities in residential schools that have completed their education and are eligible for more integrated services within the community. (Am. Compl. ¶¶ 1-2, 21). "Residential schools" are educational placements available to those with disabilities until they reach the age of 21, at which point OPWDD is tasked with creating a discharge plan to integrate the adults into a more community-based setting. Children are placed in residential schools when it is determined that they "cannot be appropriately educated in the local school district or local educational programs due to the complexity of the child's disability." (*Id.* ¶ 121). The Amended Complaint describes residential schools as "segregated, regimented, and institutional setting[s] where all residents have disabilities." (*Id.* ¶ 76). According to DRNY, there are at least 300 Adults Awaiting Discharge. (*Id.* ¶ 132).

Thomas is one such Adult Awaiting Discharge. He is a 22-year-old with Prader-Willi Syndrome and moderate intellectual disability that "substantially limit[s] one or more of his major life activities, including eating, learning, processing information, concentration, and communicating." (*Id.* ¶¶ 23, 27, 99). Thomas has been housed at a residential facility, Woods Services, Inc. ("Woods"), in Pennsylvania for the past 10 years. (Am. Compl. ¶ 25). At Woods, Thomas faces "a variety of limitations to his personal freedom, including assigned roommates, set meals and meal times, staff access into personal quarters, and limited ability to access the community independently." (*Id.* ¶ 28). Woods is located 185 miles from Thomas's family, making it difficult for his mother, who has Lupus, to visit him. This results in an "extremely isolating" environment. (*Id.* ¶¶ 109-111). Although Thomas is qualified to live in a more

integrated residence and desires to do so, he has been awaiting a move to a New York community residence since 2017.  (*Id.* ¶¶ 29, 115).

Defendant OPWDD is a public entity operating under New York's Mental Hygiene Law § 13.09.  (*Id.* ¶¶ 47-48).  Cuomo is the Governor of New York and is responsible for ensuring New York's services conform with the Mental Hygiene Law, the ADA, and the Rehab Act.  (Am. Compl. ¶¶ 39-40).  He "is vested with the power to appoint subordinates and employees . . . including appointing the Acting Commissioner of OPWDD."  (*Id.* ¶¶ 41-42).  Delaney is the Acting Commissioner of OPWDD and is responsible for its operation, including its programs for adults with disabilities.  (*Id.* ¶¶ 51-52).  Plaintiffs are suing both Delaney and Cuomo in their official capacities.  (*Id.* ¶¶ 45, 53).

These defendants "are responsible for coordinating and effectuating the discharge of Adults Awaiting Discharge to an integrated and appropriate setting in New York State when they age out of residential school at age 21."  (*Id.* ¶ 3).  Plaintiffs allege, however, that Defendants do not begin planning for discharge with enough time to integrate adults with disabilities into community placements at a reasonable pace, thus causing individuals to be institutionalized for at least one year after they age out of residential school.  (Am. Compl. ¶¶ 4-5, 9).  For example, OPWDD has been responsible for Thomas's residential placement since 2016 but has not presented a plan for community integration nor given him the opportunity to receive services in an integrated setting.  (*Id.* ¶¶ 31-35).  As a result, Thomas and other Adults Awaiting Discharge are "denied the opportunity to participate and/or benefit from OPWDD community-based services solely on the basis of their disability."  (*Id.* ¶ 10).

The Amended Complaint contains three causes of action: violations of (1) ADA's Title II integration mandate, (*id.* ¶¶ 141-156); (2) ADA's Title II reasonable modification mandate, (*id.* ¶¶ 157-172); and (3) Section 504 of the Rehab Act, (Am. Compl. ¶¶ 173-187).  Plaintiffs seek a declaratory judgment, injunctive relief requiring Defendants to discharge Thomas and other similarly situated individuals, and injunctive relief requiring Defendants to begin the discharge process for students in residential schools at age 16 and develop written discharge plans by age 18.  (Relief Requested, attached to Am. Compl., Dkt. No. 28 ("Prayer for Relief") ¶¶ 1-3).  Plaintiffs also seek compensatory damages and reasonable costs and attorney's fees.  (*Id.* at ¶¶ 5-6).

Defendants filed a motion to dismiss on December 13, 2018 arguing that both DRNY and Thomas lacked standing and each had failed to allege a viable ADA or Rehab Act claim.  (*See* Defs.' Mot.; *see also* Defs.' Mem. of Law in Supp. filed Dec. 13, 2018, Dkt. No. 40 ("Defs.' Mem.")).  The same day, as per the Court's bundling rule, Plaintiffs' response and Defendants' reply were filed.  (*See* Pls.' Mem.; Defs.' Reply Mem. of Law filed Dec. 13, 2018, Dkt. No. 43 ("Defs.' Reply")).  The Court held oral argument on the motion on January 30, 2019.  (*See* Min. Entry dated Jan. 30, 2019; Tr. of Mot. to Dismiss Hr'g on Jan. 30, 2019 filed Feb. 19, 2019, Dkt. No. 51 ("Jan. 30 Tr.")).[1]  As explained below, the motion to dismiss should be granted in part.

---

[1] While this motion was pending, the Second Circuit held oral argument in *Disability Rights New York v. New York*, in which the standing of DRNY was an issue on appeal.  The Second Circuit decided the case on abstention grounds and did not reach the question of standing.  *See Disability Rights N.Y. v. New York*, 916 F.3d 129, 131 n.1 (2d Cir. 2019).

DISCUSSION

I.    Standing

"Article III limits federal judicial power to 'Cases' and 'Controversies,' and standing to sue 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (citation omitted) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

A.    Legal Standards for Rule 12(b)(1) Motions

"The party seeking to invoke the [jurisdiction] of the court bears the burden of establishing that he has met the requirements of standing." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the elements of standing]."). "[T]o survive a defendant's motion to dismiss for lack of subject matter jurisdiction [under Rule 12(b)(1)], a plaintiff must allege facts 'that affirmatively and plausibly suggest that it has standing to sue.'" *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 227 (E.D.N.Y. 2015) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)); *see also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).[2]

---

[2] Some cases suggest that standing can be raised as "either a Rule 12(b)(1) or a Rule 12(b)(6) motion." *Glasser v. Cohen*, No. 05-CV-6993, 2008 WL 4104024, at *4 n.4 (S.D.N.Y. Aug. 28, 2008). However, "standing is at heart 'a jurisdictional prerequisite to a federal court's deliberations,'" *Thompson v. Cty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994) (quoting *Hodel v. Irving*, 481 U.S. 704, 711 (1987)), and thus it is more appropriately analyzed under Rule 12(b)(1). *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1), the proper procedural route is a motion under Rule 12(b)(1). The distinction is

Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (quotations and alterations omitted).

Furthermore, "[w]hen the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it," a plaintiff is not required to come forth with evidence supporting her assertion of standing.  *Carter*, 822 F.3d at 56.[3]  The plaintiff has, at this stage, no evidentiary burden.  *Id.*  "[T]he court must accept as true all material factual allegations in the complaint and refrain from drawing inferences in favor of the party contesting jurisdiction." *Zirogiannis v. Seterus,*

---

important because a typical dismissal under Rule 12(b)(6), *i.e.*, for failure to state a claim, is an adjudication on the merits with preclusive effect[.]  Presenting and considering a challenge to lack of Article III standing under Rule 12(b)(1) avoids the needs to fashion a modified approach to a Rule 12(b)(6) motion that concerns standing.") (citations omitted).

[3] On the other hand, if a defendant's Rule 12(b)(1) motion is fact-based and she proffers evidence outside the pleadings, a plaintiff must "come forward with evidence of [her] own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion reveal the existence of factual problems in the assertion of jurisdiction." *Carter*, 822 F.3d at 57 (quotations and alterations omitted).  Defendants here present no evidence outside the pleadings, and their challenge is facial.

*Inc.*, 221 F. Supp. 3d 292, 297 (E.D.N.Y. 2016) (quotations omitted), *aff'd*, 707 F. App'x 724 (2d Cir. 2017); *see also Amadei v. Nielsen*, 348 F. Supp. 3d 145, 154 (E.D.N.Y. 2018) ("In cases . . . where a 12(b)(1) motion is based solely on the uncontroverted allegations of the complaint—a facial 12(b)(1) motion—the court must accept as true all material factual allegations of the complaint and draw all reasonable inferences in favor of Plaintiffs.") (quotations and alterations omitted).

"[A] court must dismiss a claim if, among other things, it determines that the plaintiff lacks standing to prosecute it." *Melrose Credit Union v. City of N.Y.*, 247 F. Supp. 3d 356, 363 (S.D.N.Y. 2017) (citing *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006)), *aff'd sub nom. Progressive Credit Union v. City of N.Y.*, 889 F.3d 40 (2d Cir. 2018); *see also Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim.") (quotations omitted).

B.   Standing of DRNY

The "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560, requires the party invoking federal jurisdiction to show "(1) *injury-in-fact*, which is a 'concrete and particularized' harm to a 'legally protected interest,'; (2) *causation* in form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (quoting *Lujan*, 504 U.S. at 560-61). "Supplementing these constitutional requirements," there is a "prudential doctrine of standing" that encompasses "several judicially self-imposed limits on the exercise of

federal jurisdiction." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996).

Defendants do not challenge DRNY's standing with respect to the three constitutional requirements for standing—injury, causation, and redressability.  Instead, their motion rests on the additional "prudential" standing requirements.  "Prudential standing" encompasses a series of judicially-created doctrines that limit the cases that may be heard in federal court.  That is, they are rules that derive not from Article III, but from the courts' own maximization of "administrative convenience and efficiency."  *Id.* at 557; *see* also *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) ("The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.") (quotations omitted).

There are three "broad" categories of "prudential standing" rules.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).  The first is the third-party rule: the bar on a litigant from "raising another person's legal rights."  *Id.* (quotations omitted).  The second is the "rule barring adjudication of generalized grievances," and the third is "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Id.* (quotations omitted).

The standing question in this case concerns limits of the first prudential barrier—the third-party standing bar.  The third-party standing bar provides that a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see* also *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015).

This prohibition

> assumes that the party with the right has the appropriate incentive to
> challenge (or not challenge) governmental action and to do so with the
> necessary zeal and appropriate presentation.  It represents a healthy
> concern that if the claim is brought by someone other than one at whom the
> constitutional protection is aimed, the courts might be called upon to decide
> abstract questions of wide public significance even though other
> governmental institutions may be more competent to address the questions
> and even though judicial intervention may be unnecessary to protect
> individual rights.

*Kowalski*, 543 U.S. at 129 (quotations and citations omitted).  The bar is not "absolute,"

and "there may be circumstances where it is necessary to grant a third party standing to

assert the rights of another."  *Id.* at 129-30.

One such exception is "associational standing."  The doctrine of "associational

standing addresses those cases where an organization seeks to assert its members'

injury, but the organization itself has not suffered any injury.  *United Food, Inc.*, 517

U.S. at 552.  Defendants' motion first argued that DRNY cannot establish "associational

standing."  (*See* Defs.' Mem. at 7-12).  DRNY, in response, disclaimed any reliance on

associational standing.  (*See* Pls.' Mem. at 9-10).  It argued, instead, that as a P&A

system it was authorized to bring claims on behalf of others.  According to DRNY the

law creating P&A systems establishes statutory authorization to bring lawsuits on behalf

of the Adults Awaiting Discharge.  (*See id.* at 10-13).  And it contends this statutory

authorization is sufficient to overcome any prudential restraints on DRNY's standing.

The Court disagrees.  DRNY, even though authorized under statute to bring

claims on behalf of others, is asserting injuries that it did not suffer, but were suffered

by third-parties.  In this Circuit, there is a bar on such third-party standing.

"Associational standing" is one means to overcome that prohibition; but that is a

doctrine that DRNY argues is inapplicable.  But what DRNY asserts in its place—a kind

of "statutory authorization to sue"—is not an exception to the barrier on third-party standing. The Court first discusses associational standing, because the parties spill much ink on the topic and understanding associational standing is helpful to understand both parties' current position on standing. And then the Court explains why the standing doctrine DRNY espouses still does not permit it to sue on behalf of the Adults Awaiting Discharge.

The test for "associational standing" developed from a trilogy of Supreme Court cases—*Warth v. Seldin,* 422 U.S. 490 (1975), *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), and *Automobile Workers v. Brock*, 477 U.S. 274 (1986)—and requires a plaintiff organization to demonstrate: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Hunt*, 432 U.S. at 343. These three elements are referred to as the *Hunt* requirements or *Hunt* elements.

Whether DRNY has associational standing to assert its members' rights was first addressed—though not decided—by the Second Circuit in *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012) (hereinafter "*DAI*"). When *DAI* was filed in the Eastern District of New York, New York had "designated the Commission on Quality of Care and Advocacy for Persons with Disabilities [CQC] as the State's P & A system for persons with mental illness." *Id.* at 153. CQC contracted with Disability Advocates, Inc. ("DAI")—DRNY's predecessor—to provide those protection and advocacy services. *Id.*

In 2003, DAI sued various New York state officials and agencies—namely, the New York State Department of Health, the New York State Department of Mental Health, the commissioners of those two agencies, and the Governor of New York—on behalf of New Yorkers with mental illness who "reside, or might one day reside, in specified 'adult homes' in New York City." *Id.* at 154. The lawsuit, like the present one, raised alleged violations of the integration mandate of Title II of the ADA and Section 504 of the Rehab Act. *Id.*

The question before the Second Circuit was whether DAI had associational standing to bring such a suit. *DAI*, 675 F.3d at 152. Specifically, the issue was whether DAI could satisfy the first prong of the associational standing test, *i.e.*, demonstrate that DAI's constituents would have standing to sue in their own right. *Id.* at 157. DAI was— and DRNY now remains—a non-membership organization. A non-membership organization may sue on behalf of their constituents only if they "function effectively as a membership organization." *Id.* (quotations and alterations omitted). This ensures that the organization has a constitutionally sufficient "stake in the controversy." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261-62 (1977). To meet this requirement, the organization's "constituents must nevertheless possess sufficient 'indicia of membership.'" *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015) (quoting *Hunt*, 432 U.S. at 344); *DAI*, 675 F.3d at 158. In *Hunt*, for instance, the plaintiff, the Washington State Apple Advertising Commission, was a state agency—not a private organization—that had no members and was not a membership organization. *Hunt*, 432 U.S. at 344. Nevertheless, it had sufficient "indicia of membership" because its constituents (the apple growers and dealers in Washington) elected the members of the Commission and financed it. *Id.* at 344-45.

P&A systems are required to establish an advisory council chaired by individuals who have or are receiving mental health services or their family members, among others, and a grievance system to ensure clients have full access to the P&A system's services.  42 U.S.C. § 10805(a).  When *DAI* was decided, there was a circuit split on whether such features constituted sufficient "indicia of membership" to confer associational standing on a P&A system.  Two circuits—the Ninth and Eleventh—concluded that a P&A system did have associational standing.  *See Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999).  Two other circuits—the Fifth and Eighth—reached the opposite conclusion.  *See Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994); *Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007).

The circuit split has not been resolved.  The Supreme Court has not decided the issue.  Nor has the split deepened.  No other circuit has addressed the question.  In *DAI*, although identifying the divergent views, the Second Circuit found it unnecessary to decide whether a P&A system has associational standing, because DAI was not a P&A system, but *a contractor* of such a system.  *DAI*, 675 F.3d at 158 ("We need not—and do not—decide which of our sister circuits has the better of this argument[.]").[4]

After *DAI* was decided, DAI changed its name to DRNY and became New York's P&A system.  DRNY is no longer just a contractor.  (Am. Compl. ¶¶ 16-18).  And now

---

[4] The court did determine that, as a contractor, DAI did not have associational standing.  It did so for a number of reasons, including the fact that there was "scant evidence in the record that the individuals with mental illness whom DAI purports to represent have the power to elect its directors, make budget decisions, or influence DAI's activities or litigation strategies."  *DAI,* 675 F.3d at 158-59.

DRNY has brought a lawsuit similar to the one it previously brought—namely, one that sues New York state agencies and officials for violating the ADA and Rehab Act's integration mandate and the ADA's reasonable modification mandate.  DRNY's lawsuit challenges the continued institutionalization of adults with disabilities in residential schools after their education is complete.  (*Id.* ¶¶ 9-10).  Again, as they did in *DAI*, the New York State defendants have challenged the organization's standing.

DRNY had a straightforward avenue to demonstrate standing: address the question left open in *DAI*, *i.e.*, whether a P&A system has associational standing.  That is, DRNY could have argued why the approach of the Ninth and Eleventh Circuits— which found that a P&A system has associational standing—is the correct one and one that the Second Circuit can be expected to adopt on appeal.  To do so, DRNY would have marshalled the arguments demonstrating that although it has no "members," the structure of a P&A system and the relationship between DRNY and the people it serves demonstrate that its constituents have the "indicia of membership."  And as a result, the argument would go, DRNY can sue on behalf of those individuals with disabilities, even though DRNY itself suffered no injury.

DRNY has chosen not to follow this path.  It has disavowed it and any attempt to show that it has associational standing.  In response to Defendants' motion to dismiss, which argued that DRNY failed to satisfy any of the three elements for associational standing, DRNY stated that it did not need to make such a showing.  It stated, "DRNY is not asserting 'associational standing' in this case, as set forth in *Hunt*[.]"  (Pls.' Mem. at 9).  When asked at oral argument why it had failed to address the circuit split identified in *DAI*, DRNY said the same thing: it was not trying to prove associational standing. (Jan. 30 Tr. at 30:15-19 ("DRNY is not asserting associational standing, is not relying on

any of the other circuit cases, which we firmly believe rely upon *Hunt*, to come to the conclusion of whether a P&A has standing or does not have standing."); *id.* at 42:25-43:7 (The Court: "[Y]ou are not resting at all on—and you're not asking this court to decide the bracketed question in *DAI*[.]" Ms. Monthie: "Right." The Court: "[W]hich of the four circuits has the better of the argument? You're not asking me to predict that?" Ms. Monthie: "I'm not asking you to predict that."); Pls.' Mem. at 12 ("Defendants' reliance on *Hunt* is misplaced. The *Hunt* analysis pertains to the presence or absence of associational standing, which DRNY has not asserted in this case.")).

This position is a complete mystery to this Court. The cases that hold that a P&A system like DRNY has associational standing are legion. *See, e.g.*, *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F. Supp. 2d 872, 880 (S.D. Ind. 2009) ("Congress granted IPAS standing by statute, and IPAS has sufficiently pled actual injury to its constituents so as to meet the constitutional requirements of Article III standing under *Hunt*[.]"); *N.J. Prot. & Advocacy, Inc. v. Davy*, No. 05-CV-1784, 2005 WL 2416962, at *2 (D.N.J. Sept. 30, 2005) ("This Court is more persuaded by the approach of the Eleventh and Ninth Circuits in finding that persons with mental illness are the functional equivalent of members of PAMII organizations like NJP & A for purposes of associational standing."); *Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.*, No. 05-CV-585, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005) ("PAIMI authorizes organizations like ULS to pursue claims for system-wide change on their own behalf as an advocacy organization under § 10805(a)(1)(B) and seek legal remedies on behalf of individuals meeting the criteria under § 10805(a)(1)(C). By providing such entities this authority to sue on behalf of their constituents, Congress has cleared away any non-constitutional impediments for ULS—including the third prong of *Hunt*—in the

situations stated in § 10805."); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 71 (D. Me. 2000) ("Given the Supreme Court's reasoning in *Hunt* and the indicia of membership evidenced by the statutory scheme providing for the participation of the beneficiaries of DRC's activities, the Court chooses to follow the Eleventh Circuit's reasoning and concludes that DRC's status as a nonmembership organization does not preclude its standing to sue on behalf of the individuals it is charged with protecting.") (citations omitted).

Not only does DRNY not cite any of these cases, but it disavows them by disclaiming any reliance on—or desire to establish—associational standing.  Of course, for this Court to determine that DRNY has associational standing, DRNY would have to satisfy the three elements of *Hunt*.  Perhaps unwilling or unable to make that showing, DRNY has resorted to a different standing doctrine.

Instead, DRNY argues that it has "representational standing."  Its theory is that Congress may confer standing upon any entity or organization via statute.  (Jan. 30 Tr. at 30:21-25 ("Congress can . . . create a relationship through statute to permit standing[.]")).  According to DRNY, if a statute does so, that ends the standing inquiry; no further inquiry is required.  DRNY argues that "representational standing" only requires it to demonstrate that the P&A statute authorizes DRNY to bring a lawsuit. (*See* Pls.' Mem. at 10-13).  This standing doctrine is one of DRNY's own creation that has no support in any caselaw—Supreme Court or otherwise—and has never been applied to a P&A system.  DRNY's litigation strategy is entirely divorced from, and has no support in, the doctrinal underpinnings of standing.

DRNY tries to argue that its peculiar "representational standing" doctrine has its roots in the Supreme Court's decision in *United Food and Commercial Workers Union*

*Local 751 v. Brown Group, Inc.* (*See* Pls.' Mem. at 9-10). The argument has no merit. In *United Food*, the Supreme Court addressed whether a union had standing to sue for an employee's back wages under the federal Worker Adjustment and Retraining Notification Act ("WARN Act"). 517 U.S. at 545-46. The WARN Act obligates certain employers to provide notice to employees before a mass layoff or plant closing; failure to do so requires the employer to provide backpay, and the statute authorizes a union to sue for the employee's wages. *Id.* By authorizing the union to sue, the WARN Act did not require the individual employee to participate in the litigation. The question presented to the Supreme Court was whether the union had associational standing. In particular, the Court decided whether the third *Hunt* element—the requirement that the claim asserted or relief sought does not require participation of the individual member— can be abrogated by statute. *Id.* at 546, 551. The first two *Hunt* elements were not at issue in *United Food.* The union had established that its members would otherwise have standing to sue in their own right and the interests it sought to protect were germane to its purpose. *Id.* at 553-54.

The Supreme Court held that the third *Hunt* element could be abrogated by statute. That is, the fact that the individual employee was not participating in the lawsuit did not prevent an organization from having standing, as long as Congress authorized the organization's involvement. And in the WARN Act Congress did authorize a union to bring a suit on behalf of its member employees. *Id.* at 558 ("Because Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed, there is no question that Congress may abrogate the impediment.").

DRNY contorts this holding to argue that *United Food* announced another type of standing, a non-associational version, that permits Congress to simply confer standing upon an organization.  This is a gross misreading of *United Food*.

First and foremost, *United Food* is indisputably an associational standing case. The case was framed as one about associational standing, from the question presented in the certiorari grant to the extended discussion of the doctrine in the opinion itself. 517 U.S. at 551 ("The question here is whether a bar to the union's suit found in the test for so-called associational standing is constitutional and absolute, or prudential and malleable by Congress.").  In the more than two decades since *United Food* was decided, no court has applied the case to a P&A system without discussing the case in terms of associational standing.  *See, e.g.*, *Mink*, 322 F.3d at 1109-13; *Mental Hygiene Legal Serv. v. Cuomo*, 13 F. Supp. 3d 289, 293-94 (S.D.N.Y. 2014), *aff'd*, 609 F. App'x 693 (2d Cir. 2015); *Mental Disability Law Clinic v. Hogan*, No. 06-CV-6320, 2008 WL 4104460, at *5-6 & n.8 (E.D.N.Y. Aug. 29, 2008); *Risinger*, 117 F. Supp. 2d at 68-71. Therefore, to properly fall within *United Food*, DRNY has to establish that it had associational standing.  That means DRNY would have to demonstrate that it could satisfy each of the three *Hunt* elements; and as a non-membership organization, that requires showing its constituents have "indicia of membership."  *DAI*, 675 F.3d at 157. As explained, DRNY makes no attempt to meet that test, having disavowed associational standing.

Although *United Food* contains the unremarkable statement that associational standing is "only one strand" of "representational standing," the Supreme Court was not announcing a new doctrine.  *See United Food*, 517 U.S. at 557.  The concept of "representational standing," the idea that one can raise the interests of others, is present

in a multitude of cases. "In several cases, [the Supreme Court] has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth*, 422 U.S. at 510 (citing *Doe v. Bolton*, 410 U.S. 179, 188 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965); *Barrows v. Jackson*, 346 U.S. 249 (1953)). Membership organizations can sue on behalf of its members. *Id.* at 511. A non-membership organization can sue because of its association to its constituents. *Hunt*, 432 U.S. at 344-45; *see also N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 9 (1988). These types of "representational standing" are exceptions to the third-party standing bar. Associational standing is one such exception. Another exception—discussed below—is based upon the relationship between the plaintiff and individuals who cannot raise their own claims. Ultimately, however, that such exceptions were referred to in *United Food* as "representational standing" does not mean—as DRNY argues—that a new doctrine was developed by the Supreme Court.

The other cases DRNY cites do not interpret *United Food* to create a new category of standing. (*See* Pls.' Mem. at 11-12). These cases are properly understood as associational standing cases, a doctrine that DRNY is not relying upon and has disavowed. In *Goldstein v. Coughlin*, the Court held that a P&A system "need show no injury to itself in order to have standing." 83 F.R.D. 613, 614 (W.D.N.Y. 1979). That is a conclusion tethered to associational standing—the doctrine presupposes that the organization has suffered no injury itself. *See Hunt*, 432 U.S. at 342 ("[A]n association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity[.]"). *Goldstein* relies upon the other case cited by DRNY: *Naughton v. Bevilacqua*, 458 F. Supp. 610 (D.R.I. 1978), *aff'd*, 605 F.2d 586 (1st

Cir. 1979).  *Naughton* concluded that Rhode Island's P&A system need not show a separate injury from a mentally disabled resident to intervene on his behalf.  *Id.* at 616 n.3.  In reaching this conclusion, *Naughton* relied on *Sierra Club v. Morton*, 405 U.S. 727 (1972).  *See Naughton*, 458 F. Supp. at 616 n.3.  *Sierra Club* is also an associational standing case; it held that an organization could not have standing if it claims no injury itself and does not represent a member who has suffered injury.  405 U.S. at 739-40.  It was because of *Sierra Club* that organizations were forced to assert claims of members. *See Hunt*, 432 U.S. at 342-43 (citing *Sierra Club*, 405 U.S. at 739, and articulating requirements for associational standing); *Warth*, 422 U.S. at 511 ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.") (citing *Sierra Club*, 405 U.S. at 734). In sum, the cases cited by DRNY do not hold that a P&A system automatically has standing; they are associational standing cases.

If DRNY is not using associational standing, it must qualify for some exception to the third-party standing bar.  "'Typically, a plaintiff who asserts the claims of a third party can obtain standing by establishing (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests.'"  *Keepers*, 807 F.3d at 41 (quoting *Smith v. Hogan,* 794 F.3d 249, 255 (2d Cir. 2015)).  DRNY could have made such an argument in this case.  It could have argued that, for instance, as a P&A system it has a unique relationship to its disabled patients and those patients cannot, for a multitude of reasons, litigate their own claims.  It did not do so.  DRNY's brief makes no mention of any particular barriers to suit; importantly, neither does the Amended Complaint.

DRNY is bringing claims on behalf of others: those individuals who have not been integrated from their residential schools.  In doing so, DRNY runs headlong into the third-party standing bar, which prohibits a plaintiff from asserting the injuries of another.  The Supreme Court has "adhered to th[is] rule."  *Kowalski*, 543 U.S. at 129. DRNY has failed to allege or demonstrate that an exception to the prohibition on third-party standing applies to it.  DRNY therefore lacks standing, and its claims must be dismissed.  *See, e.g.*, *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 571 (E.D.N.Y. 2011) (dismissing claim for failure to establish third-party standing exception); *Juvenile Matters Trial Lawyers Ass'n v. Judicial Dep't*, 363 F. Supp. 2d 239, 246, 248, 251 (D. Conn. 2005) (granting motion to dismiss for failure of an organization to establish standing in its own right, failure to establish associational standing, and failure to overcome the third-party standing doctrine).

*      *      *

The Supreme Court—in 2014 in *Lexmark International, Inc. v. Static Control Components, Inc.*—addressed the third prudential barrier to standing: the "zone of interests" requirement.  The Supreme Court held—in addressing a plaintiff's standing to bring a claim under the Lanham Act—that "[w]hether a plaintiff comes within the zone of interests is an issue [of] whether [the] legislatively conferred cause of action encompasses a particular plaintiff's claim."  572 U.S. at 127 (quotations omitted).  In other words, if a federal statute permits a plaintiff to bring a claim, a court may not conclude that the plaintiff is outside of the "zone of interests" that the law protects and thereby preclude the lawsuit.  *Id.* at 128 ("[W]e ask whether [plaintiff] has a cause of action under the statute. . . .  [A court] cannot limit a cause of action that Congress has created merely because 'prudence' dictates.").

*Lexmark* is not about the third-party bar.  The Supreme Court went out of its way to point out that it was not addressing the third-party rule or whether that doctrine was properly considered a prudential rule or instead rooted in Article III.  *Id.* at 127 n.3 ("This case does not present any issue of third-party standing, and consideration of that doctrine's proper place in the standing firmament can await another day.").  Nonetheless, having concluded that the "zone of interests" bar to standing must give way when a statute confers standing on a plaintiff, it is not a stretch to argue that other prudential limitations, like the third-party bar, cannot preclude a plaintiff authorized to sue by statute.

Indeed, the Supreme Court has previously suggested that the third-party bar is a question of statutory authorization.  *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990) ("Whether a litigant can assert the rights of a third party under a particular statute is closely related to the question whether a person in the litigant's position would have a right of action on the claim.") (quotations omitted).  And one scholar of constitutional law has pointed out that "zone of interests" standing is coextensive with the third-party bar.  *See* Lawrence H. Tribe, American Constitutional Law § 3-19, at 446 (3d ed. 2000) ("Properly conceived, the zone-of-interest inquiry is part of third-party standing analysis: to say that a particular plaintiff's claim does not fall within the zone of interests . . . is another way of saying that the right claimed is one possessed not by the party asserting it, but rather by others, and that the plaintiff will not have standing to assert a violation of these rights of absent third parties, whose claims *would* fall within the applicable zone of interests.").  Presumably this is why the Second Circuit recently noted that "[t]here is considerable uncertainty as to whether the third-party standing rule continues to apply following [*Lexmark*]" and that "[i]n *Lexmark*, the Supreme

Court cast doubt on the entire doctrine of prudential standing." *N.Y. State Citizens'*

*Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019).

But at this point, the bar to third-party standing remains.  DRNY for its part does

not cite to *Lexmark*, let alone argue that *Lexmark* should be extended to override the

third-party bar.  The Second Circuit continues to apply the third-party bar after

*Lexmark*.  *E.g.*, *id*; *Keepers*, 807 F.3d at 45.  To overcome that bar and assert the rights

of the mentally disabled in New York, DRNY was required to show that an exception to

that prohibition applied.  *E.g.*, *Poole*, 922 F.3d at 75-76.  It did not, and its claims must

be dismissed.[5]

C.    Standing of Individual Plaintiff Thomas

As stated earlier, in order to have standing, a plaintiff must satisfy three

elements: (1) injury-in-fact; (2) causation; and (3) redressability.  *Lujan*, 504 U.S. at

560-61.  Defendants argue Thomas has failed to plead sufficient facts as to each of the

three elements of standing.  (*See* Defs.' Mem. at 12-16).[6]

_____

[5] Even if DRNY had demonstrated its qualification for an exception to the third-party bar, it would still have to demonstrate that those on whose behalf it was suing met the constitutional requirements for standing.  *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").  That would require, among other things, DRNY to show that each of the injuries of those it represented can be redressed.

[6] Defendants make several arguments within their discussion of each element that are more applicable to their 12(b)(6) motion, including that Plaintiffs failed to: (1) show they have a right to services under the Mental Hygiene Law, (Defs.' Mem. at 13); (2) allege that any discrimination Thomas faced was a result of his disability, (*id.*); (3) "provide any authority that OPWDD was required to do anything more than it has done" for Thomas, (Defs.' Reply at 5); (4) plead facts showing it was possible for Thomas to be integrated into a community placement sooner than what is currently scheduled, (Defs.' Mem. at 13); and (5) plead facts showing any delay in Thomas's placement was unreasonable, (Defs.' Reply at 5).  These do not inform the question of whether Thomas

1.     Injury in Fact

"An 'injury in fact' is a harm that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Small v. Gen. Nutrition Cos., Inc.*, 388 F. Supp. 2d 83, 86 (E.D.N.Y. 2005) (quoting *Lujan*, 504 U.S. at 560); *see also Jaghory*, 131 F.3d at 330 ("'The keystone for determining injury in fact is the requirement that it be distinct and palpable—and, conversely, that it not be abstract or conjectural or hypothetical.'") (quoting Laurence H. Tribe, American Constitutional Law § 3-16, at 114 (2d ed. 1988)) (quotations omitted).  "'The actual or threatened injury required . . . may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing[,]' [and thus] an allegation that defendants have violated the ADA and the Rehabilitation Act may suffice as an allegation of injury-in-fact."  *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 237 (S.D.N.Y. 1996) (quoting *Warth*, 422 U.S. at 500)) (quotations omitted), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997).

Here, Thomas bases his claims on violations of the ADA and Rehab Act's integration mandate and the ADA's reasonable modification mandate.  (*See* Am. Compl. ¶¶ 141-187; Pls.' Mem. at 6, 16).  "Through the ADA and the [Rehabilitation Act], Congress has elevated the segregation of individuals with disabilities 'to the status of a legally cognizable injury.'"  *Murphy ex rel. Murphy v. Minn. Dep't of Human Servs.*, 260 F. Supp. 3d 1084, 1101 (D. Minn. 2017) (quoting *Spokeo*, 136 S. Ct. at 1549) (alterations omitted).  Although "Congress'[s] role in identifying and elevating . . . harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right," *Spokeo*, 136 S. Ct. at 1549, the

---

suffered an injury, who caused the injury, and whether the relief sought in this suit would remedy the injury; the Court thus addresses those arguments in Section II below.

segregation of people with disabilities is an injury-in-fact for the purposes of standing if concrete and particular to the plaintiff.

Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, § 504 of the Rehab Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The Attorney General adopted regulations to implement those statutory provisions.  According to the Attorney General's integration regulation, "[a] public entity shall administer services, programs, and activities in the *most integrated setting* appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (emphasis added); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591-92 (1999).[7]  The reasonable-modifications regulation requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).

---

[7] The "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. § Pt. 35, App. B.

In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court held that under Title II of the ADA, "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated."  527 U.S. at 607.  A failure to integrate such individuals into the community is "unjustified isolation" that constitutes disability discrimination.  *Id.* at 597.  Two harms flow from this discrimination: (1) the perpetuation of "unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"; and (2) the restriction of "the everyday life activities of individuals, including family relations, social contracts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 600-01.

Defendants argue that: (1) OPWDD did develop discharge plans and implement procedures to assist Thomas, and that Plaintiffs have conceded as much; and (2) Plaintiffs "failed to demonstrate that Defendants *could have* completed . . . Thomas's transition to the community . . . any sooner than his currently scheduled transition." (Defs.' Mem. at 13; *see also* Defs.' Reply at 5).  Thomas argues that Defendants mischaracterize Thomas's injury and that "[u]njustified segregation resulting from Defendants' failure to comply with the [ADA's] integration mandate constitutes an injury in fact."  (Pls.' Mem. at 6).  Thomas is correct.

Thomas has alleged sufficient facts to establish a concrete and particularized ADA and Rehab Act-based injury.  Thomas is institutionalized in a residential school; he is eligible to be placed in a more integrated setting; and such an accommodation is one he desires.  (Am. Compl. ¶¶ 29-35, 155).  In his current location, Thomas has been

"subject to a variety of limitations to his personal freedom, including assigned roommates, set meals and meal times, staff access into personal quarters, and limited ability to access the community independently." (*Id.* ¶ 28). Due to his institutionalization, Thomas has been isolated from his family. (*Id.* ¶¶ 109-113). This is an *Olmstead* injury, *see* 527 U.S. at 600-01, and Thomas has alleged enough facts to infer that such harm is concrete and particular to him. *See, e.g.*, *Murphy*, 260 F. Supp. 3d at 1101 ("The primary injury Plaintiffs allege they are facing is segregation. While perhaps not tangible, this injury is indeed concrete and particular to Plaintiffs. . . . In the Amended Complaint, Plaintiffs allege particular and personal examples of segregation. . . . Plaintiffs also allege that the injury of segregation can itself result in further harm for many individuals residing in CRS facilities, including diminished social and independent living skills, decreased likelihood of living and working in the community in the future, and lower self-esteem and lowered expectations of themselves. These allegations sufficiently establish an injury-in-fact to support Plaintiffs' claims under the ADA and the [Rehabilitation Act].") (quotations and citations omitted).

2.  Causation

Causation requires that "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotations and alterations omitted). "Significantly, though, proximate causation is *not* a requirement of Article III standing, which requires only that the plaintiff's injury be *fairly traceable* to the defendant's conduct." *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 574 (S.D.N.Y. 2019). In other words:

> The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury.  Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue.  However, while the indirectness of an injury may make it substantially more difficult to show the "fairly traceable" element of Article III standing, *i.e.*, to establish that, in fact, the asserted injury was the consequence of the defendants' actions, indirectness is not necessarily fatal to standing, because the "fairly traceable" standard is lower than that of proximate cause. . . .  Accordingly, we . . . have noted that, particularly at the pleading stage, the "fairly traceable" standard is not equivalent to a requirement of tort causation and that for purposes of satisfying Article III's causation requirement, we are concerned with something *less than the concept of proximate cause.*

*Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013) (quotations and citations omitted); *see also Lexmark*, 572 U.S. at 134 n.6 ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").

Thomas argues that Defendants are responsible for coordinating and effectuating his discharge from his current residential facility and that their failure to do so at a reasonable pace has caused him to be unnecessarily institutionalized.  (Pls.' Resp. at 6-7).  Defendants argue Plaintiffs have not shown that Thomas's alleged injury is fairly traceable to any of the four Defendants because they: (1) failed to connect any of the Defendants' actions or inactions to the alleged delay in Thomas's placement; and (2) did not plead facts to show Thomas's family or other third parties did not cause the alleged delay.  (Defs.' Mem. at 13-14; *see id.* at 14 n.8 ("Plaintiffs fail to acknowledge that numerous parties not before the Court play a substantial role in the process of transitioning disabled students from residential schools to the community.")).

These arguments are without merit.  For one thing, Defendants confuse proximate cause arguments with the lesser standard of "fairly traceable."  In so doing,

they confuse arguments that are more appropriate for a merits determination—the individual liability of particular defendants—with what is required at the motion-to-dismiss stage for standing purposes. At this stage, Thomas need only allege (plausibly, of course) that Defendants played some role in his injury, *i.e.*, his *Olmstead* isolation and segregation claims. He need not plead—let alone demonstrate—that these Defendants acted at the exclusion of others or that these Defendants are the most culpable parties. Such determinations can await discovery and a merits adjudication. Even an indirect role in causing an injury can be the necessary nexus for standing.

In this case, Thomas has alleged far more. He contends that well after he was able to be transitioned to a more integrated setting, he remains in an out-of-state residential facility, and that the delay is due to the actions of the named Defendants, including OPWDD. (*See* Am. Compl. ¶¶ 31-35). These allegations are sufficient to trace his *Olmstead* injury and segregation to these Defendants.

As for the argument that Thomas did not "plead facts sufficient to plausibly suggest that . . . Thomas's family and other third parties . . . did not themselves cause his transition to be delayed," (Defs.' Mem. at 13-14), that is not a requirement for standing. And the cases cited by Defendants do not support their argument.

Defendants cite to *Lujan v. Defenders of Wildlife* to argue that the presence of other actors who may have affected Thomas's placement—namely Thomas himself or his family—precludes a finding of causation as to Defendants. (*See* Defs.' Mem. at 13-14 (quoting *Lujan*, 504 U.S. at 560-62)). This mischaracterizes *Lujan*. First, in *Lujan,* the Supreme Court focused its standing decision on lack of injury and redressability, not

causation. *See Lujan*, 504 U.S. at 562-70.[8]  And while the Court did mention "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *id.* at 562, Defendants take that phrase out of context:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.  When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.  In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.  Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Id.* at 561-62 (quotations and citations omitted).

This is not *Lujan*, where the plaintiffs challenged a regulation promulgated under the Endangered Species Act pertaining to actions by third parties taken abroad.  *Id.* at 557-58.  Thomas is the "object of the action (or forgone action) at issue."  *Id.* at 561.  Thomas is not asserting injury from the government's regulation or non-regulation of "someone else"; he is asserting that OPWDD itself failed to integrate him into the

---

[8] Unlike this case, *Lujan* addressed standing after a summary judgment motion, at which stage "a plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" showing standing.  *Lujan*, 504 U.S. at 561 (quotations and citations omitted).

community.  Nor is he is arguing that Defendants are regulating a third party which in turn regulated or injured him.  Rather, it is these Defendants who have injured him directly.  Thomas has alleged that he desires community placement so that he can be closer to his family, that OPWDD has promised Thomas such a placement at New Horizons (a community residence in New York) but such placement has not yet been implemented, and that this has resulted in his wrongful institutionalization.  (Am. Compl. ¶¶ 110-120).  It can be inferred, at this stage of the proceedings, that Thomas's institutionalization is fairly traceable to OPWDD rather than the other potential actors Defendants attempt to identify.[9]  As such, "there is . . . little question that the [government] action or inaction has caused him injury."  504 U.S. at 561-62.

Defendants also cite to *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), to argue a party cannot establish standing when it is "purely speculative whether the denials of service specified in the complaint fairly can be traced to [defendants] or instead result from decisions made by [others]."  (*See* Defs.' Reply at 6 (quoting *Simon*, 426 U.S. at 42)).

In *Simon*, the problem was that plaintiffs had not named the entity responsible for the injury, but a party somewhere along the chain of causation.  426 U.S. at 41 ("We

---

[9] Defendants, in passing, identify several other actors that "play a substantial role in the process of transitioning disabled students from residential schools to the community."  (*See* Defs.' Mem. at 14 n.8).  For example, Defendants assert that the local community where disabled adults would be placed is one such actor and cite to a case where a homeowners' association challenged the location of an adult home.  (*Id.* (citing *Ramapo Homeowners' Ass'n v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 180 F. Supp. 2d 519 (S.D.N.Y. 2002))).  The argument makes little sense in this case.  The Amended Complaint asserts that Thomas already has an available placement at New Horizons, (Am. Compl. ¶ 115), and there is no indication of any opposition to the placement, let alone to an existing facility, which would prevent Thomas's relocation.

thus assume, for purpose of analysis, that some members have been denied service.  But injury at the hands of a hospital is insufficient by itself to establish a case or controversy in the context of this suit, for no hospital is a defendant.  The only defendants are officials of the Department of the Treasury, and the only claims of illegal action respondents desire the courts to adjudicate are charged to those officials.").  This case is again inapposite.  It is far from speculative that Thomas's current institutionalization is fairly traceable to OPWDD.  Indeed, Defendants admit that "OPWDD is actively pursuing community placements for all eligible individuals including Mr. Thomas," (Defs.' Reply at 5 n.6), and that "OPWWD simultaneously coordinates [the integration] process on behalf of hundreds of disabled individuals at any given time," (Defs.' Mem. at 14 n.8 (emphasis omitted)).  And by alleging a connection between OPWDD and Defendants Cuomo, Delaney, and New York State—namely that the latter Defendants are responsible for operating OPWDD, (Am. Compl. ¶¶ 37, 41, 52)—Plaintiffs have sufficiently alleged Thomas's injury is fairly traceable to all Defendants.

This case is virtually identical to *Murphy ex rel. Murphy v. Minnesota Department of Human Services*.  Plaintiffs, who were individuals with disabilities, brought ADA and Rehab Act claims alleging that the Minnesota Department of Human Services and its Commissioner—which were "responsible for overseeing the state's provision of Medicaid,"—"failed to provide transition planning and support" for plaintiffs to live in a more integrated setting and failed to modify its housing programs to promote integrated living.  260 F. Supp. 3d at 1092-93, 1095-96.  The alleged injury in *Murphy*, as here, was segregation and a failure to integrate in violation of *Olmstead*. *Id.* at 1101.  The court determined that plaintiffs—by alleging that defendants were responsible for the decisions relating to funding, overseeing housing placement, and

establishing procedures to promote integration—sufficiently established the necessary causal connection between the named defendants and the injury suffered. *Id.* at 1102. Thomas, as discussed *supra*, makes the same claims as the plaintiffs in *Murphy*.

　　　　3.　　Redressability

As to redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotations omitted); *see also Am. Bird Conservancy v. Harvey*, 232 F. Supp. 3d 292, 306 (E.D.N.Y. 2017) ("The third and final element of the standing inquiry is redressability, which requires a court to determine whether it possesses the ability to remedy the harm that a petitioner asserts.") (quotations omitted); *N.Y. State Citizens' Coal. for Children v. Velez*, No. 10-CV-3485, 2016 WL 11263164, at *4 (E.D.N.Y. Nov. 7, 2016) ("The redressability requirement is satisfied where it is likely that the plaintiff will benefit in a tangible way from the court's intervention.") (quotations omitted), *report and recommendation adopted*, 2017 WL 4402461 (Sept. 29, 2017).  Redressability is distinct from causation because it focuses on "the causal connection between the alleged injury and the judicial relief requested," rather than the "causal connection between the assertedly unlawful conduct and the alleged injury." *U.S. Dep't of Commerce*, 351 F. Supp. 3d at 575 (quotations omitted).  "[F]or a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000).  "Plaintiffs seeking injunctive relief must also prove that the identified injury in fact presents a real and immediate threat of repeated injury." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (quotations omitted).

Defendants do not challenge redressability as to the declaratory and compensatory relief sought by Thomas.  (*See* Defs.' Mem. at 15 ("Plaintiffs also have failed to plausibly show that *the injunctive relief* that they seek, if granted, actually would redress the injuries alleged.") (emphasis added); *see also id.* at 15 n.9 ("To the extent that plaintiffs request declaratory relief and compensatory damages . . . , that relief should be denied *because plaintiffs have failed to state a claim*[.]") (emphasis added); Defs.' Reply at 7 ("DRNY is silent as to how *any* of its *proposed injunctive relief* would accelerate his placement or otherwise would benefit him personally[.]") (second emphasis added)).  Thomas has standing to bring claims for declaratory and compensatory relief, even if injunctive relief, or a portion thereof, is not available.  *See Aleksanian v. Cuomo*, No. 16-CV-4183, 2017 WL 2881134, at *4 (E.D.N.Y. July 6, 2017) ("While the NYTWA may have suffered a past injury sufficient to confer standing for compensatory damages, it has not alleged 'an injury that can be redressed through the prospective declaratory and injunctive relief sought in this action.'") (quoting *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 387 (2d Cir. 2015));[10] *see also City of L.A. v. Lyons*, 461 U.S. 95, 112-13 (1983) (recognizing a plaintiff may have standing to seek damages even if he does not have standing to pursue injunctive relief).

Defendants argue injunctive relief would not redress Thomas's injuries, because he has plead "no facts that suggest that any of the proposed relief would cause [him] to be placed into the community (with New Horizons or with any other provider) *before*

---

[10] The Court interprets Plaintiffs' Prayer for Relief as seeking declaratory relief pertaining to Thomas's current institutionalization, rather than the past delay in implementing discharge plans.  (*See* Prayer for Relief ¶ 1).  This is distinguishable from *Aleksanian v. Cuomo*, where the court determined plaintiffs' *past* injury could not be redressed through declaratory relief.  2017 WL 2881134, at *4.

Spring 2019." (Defs.' Mem. at 15). Defendants again reiterate that Plaintiffs have conceded OPWDD has developed discharge plans for Thomas to be placed at New Horizons. (*Id.*).

Defendants' injunctive relief argument has no merit. Defendants again misconceive the injury claimed by Thomas, which is unnecessary institutionalization and segregation from the community. This injury can certainly be redressed by the injunctive relief Thomas seeks: the requirement that Defendants "[t]ake immediate steps to . . . *implement* discharge plans for Evan Thomas . . . so [he is] given the opportunity to live and receive services in the most integrated setting appropriate to [his] needs." (Prayer for Relief ¶ 2(a) (emphasis added)); *see, e.g.*, *Murphy*, 260 F. Supp. 3d at 1102-03 ("Plaintiffs request injunctive relief requiring Defendants to take the necessary steps to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs. The Court is persuaded at this stage that these measures would likely redress Plaintiffs' alleged harms. To be sure, Plaintiffs must ultimately provide evidence to support their allegations relating to the effectiveness of individualized housing services in leading to greater integration in the community. At this stage, however, Plaintiffs' factual allegations suffice to establish standing.") (quotations and citations omitted). Thomas's injury can be redressed by moving him to New Horizons.

Defendants also argue that Thomas lacks standing with respect to other aspects of the injunctive relief sought. (Defs.' Reply at 7). Specifically, Defendants argue Thomas would not benefit from Plaintiffs' requested injunctive relief requiring OPWDD to begin discharge planning at age 16 and develop a written discharge plan by age 18, because Thomas "is *years* past that stage of his life." (*Id.*; *see* Prayer for Relief ¶ 3). In

this respect, Defendants are correct.  Any change in policy as to when OPWDD begins planning for discharge would not, at this point, affect Thomas's placement in a more integrated setting; he is well past the age of 16 and already has a plan to be placed at New Horizons.  (*See* Am. Compl. ¶¶ 102, 115).[11]  This injunctive relief is, therefore, not redressable as to Thomas. *See MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593-94 (S.D.N.Y. 2011) ("In seeking prospective relief like an injunction, a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such judicial decree.  Past injury alone does not establish a present case or controversy for injunctive relief.  Rather, the injury alleged must be capable of being redressed through injunctive relief at that moment.") (quotations and citations omitted).  While such injury may be redressable with respect to other putative plaintiffs, Thomas lacks standing as to that injury (to the extent it is an injunctive relief sought).[12]

Therefore, Thomas has satisfied the three elements of standing at this stage in the proceedings, except as to the requested injunctive relief requiring OPWDD to begin discharge planning at age 16.  *See, e.g.*, *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 310

---

[11] There is some uncertainty in the Amended Complaint as to whether OPWDD developed the plan for Thomas.  (*Compare* Am. Compl. ¶¶ 33-35 ("OPWDD has never met with Mr. Thomas about discharge to a more integrated setting.  OPWDD has never presented a plan for discharge from Woods to Mr. Thomas.  Mr. Thomas has not been offered the opportunity to receive services in a more integrated setting appropriate to his needs."), *with id.* ¶¶ 115-116 ("Mr. Thomas was promised by Defendant OPWDD a placement in a community residence in New York State operated by the non-for-profit New Horizons in the spring of 2017.  The New Horizon[s] community residence placement has been delayed to the spring of 2019.")).  However, the Amended Complaint clearly alleges that there is a plan for Thomas to be placed at New Horizons, which has not been implemented.  (*Id.* ¶¶ 115-116).

[12] Absent class certification or other similar vehicle, Thomas cannot raise the claims of others.

(E.D.N.Y. 2008) ("[T]he complaint alleges that both of the named plaintiffs have a mental illness but no medical condition requiring a nursing home level of care, and that both are able to, qualified for, and would like to live in a more integrated setting than the nursing homes in which they reside.  Accordingly, the named plaintiffs have standing to pursue the claims they make in the second amended complaint.") (quotations and citations omitted).  Defendants' motion to dismiss Thomas's claims on standing grounds should be denied, in part.

II.      Failure to State a Claim

    A.      Legal Standards for Rule 12(b)(6) Motions

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of Plaintiff['s] claims for relief."  *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).  For a 12(b)(6) motion, the Court must "accept as true all of the factual allegations set out in plaintiff's complaint."  *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).  The Court then draws "inferences from those allegations in the light most favorable to plaintiff, and construe[s] the complaint liberally."  *Id.*; *Amadei*, 348 F. Supp. 3d at 155 ("As with a facial 12(b)(1) motion, when reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of Plaintiff[ ].").

Once the facts are construed in the light most favorable to the plaintiff, to avoid dismissal there must be sufficient facts that allege a plausible claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quotations omitted).  "[A] district court must limit

itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.  Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted).  In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).  The determination whether a plaintiff has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Escamilla v. Young Shing Trading* Co., No. 17-CV-652, 2018 WL 1521858, at *2 (E.D.N.Y. Jan. 8, 2018), *report and recommendation adopted*, 2018 WL 1033249 (Feb. 23, 2018).

Where a party has made both a Rule 12(b)(1) motion *and* a Rule 12(b)(6) motion, and the court concludes that there is no subject matter jurisdiction, it is appropriate to avoid a decision on the Rule 12(b)(6) motion.  That is because finding the absence of subject matter jurisdiction results in dismissal of the complaint, thereby mooting the remaining defenses and other arguments about the validity of the claims alleged.  *See* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004).  The Court, therefore, analyzes Defendants' 12(b)(6) motion as to Thomas only,

as DRNY has failed to establish standing to bring suit.  The Court begins by analyzing Thomas's integration and reasonable modification mandate claims against OPWDD and then addresses the claims as to the three other Defendants—Delaney, Cuomo, and New York State.

> ### B.    Sufficiency of Claims against OPWDD

Thomas's first and third claims for relief allege violations of the integration mandate under Title II of the ADA and § 504 of the Rehab Act.  (*See* Am. Compl. ¶¶ 141-156; 173-187).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132, and § 504 of the Rehab Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794.  "Claims under the two statutes are treated identically unless . . . one of the minor differences in the two disability acts is pertinent to a claim." *Joseph S.*, 561 F. Supp. 2d at 289 (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)); *see, e.g.*, *Schine ex rel. Short v. N.Y. State Office for People with Developmental Disabilities*, No. 15-CV-5870, 2017 WL 9485650, at *4 (E.D.N.Y. Jan. 5, 2017) ("[T]he Court considers Plaintiff's claims under the ADA and the Rehabilitation Act together.  Though there are minor differences between the two statutes, courts regularly analyze claims under Title II of the ADA and Section 504 of the Rehabilitation Act identically and simultaneously."), *report and recommendation*

*adopted*, 2017 WL 1232530 (Mar. 31, 2017).  Regulations promulgated pursuant to both

statutes require services to be administered in the "most integrated setting."  *See* 28

C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in

the most integrated setting appropriate to the needs of qualified individuals with

disabilities."); 28 C.F.R. § 41.51(d) ("Recipients shall administer programs and activities

in the most integrated setting appropriate to the needs of qualified handicapped

persons.").

> [T]o establish a violation of the ADA or the Rehabilitation Act,
> Plaintiffs must show that: (1) they are "qualified individuals" with a
> disability; (2) Defendants are subject to the ADA or the Rehabilitation Act;
> and (3) Plaintiffs "were denied the opportunity to participate in or benefit
> from defendants' services, programs, or activities, or were otherwise
> discriminated against by defendants, by reason of plaintiffs' disabilities."

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 640 (S.D.N.Y.

2013) (alterations omitted) (quoting *Henrietta D.*, 331 F.3d at 272).  "With respect to

the third prong, one way for a plaintiff [to] show discrimination is through a violation of

the integration mandate."  *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 185

(E.D.N.Y. 2015), *aff'd*, 633 F. App'x 14 (2d Cir. 2016); *see also Schine*, 2017 WL

1232530, at *2 (E.D.N.Y. Mar. 31, 2017) ("One form of discrimination by reason of

disability is a violation of the integration mandate of Title II of the ADA and Section

504.") (alterations omitted).[13]  "A failure to provide placement in a setting that enables

---

[13] Defendants' arguments other than those related to the integration mandate—
such as the argument that Thomas did not plead any discrimination was the result of his
disability—are therefore irrelevant.  (*See* Defs.' Mem. at 17-21); *see also Murphy*, 260 F.
Supp. 3d at 1115 ("If Plaintiffs ultimately prevail in establishing a violation of the
integration mandate based on Defendants' implementation of the Disability Waiver
programs, Plaintiffs will have established that they were subject to discrimination based
on their disabilities.  It is immaterial to the Court's analysis whether such discrimination
is considered to be by reason of disability[.]") (quotations and citations omitted)

disabled individuals to interact with non-disabled persons to the fullest extent possible

violates the ADA's integration mandate." *Joseph S.*, 561 F. Supp. 2d at 289-90

(quotations omitted).[14]

Thomas has alleged, and Defendants do not dispute, that he is a qualified

individual with a disability, (*see* Am. Compl. ¶¶ 99-101), and that OPWDD is subject to

the ADA and Rehab Act, (*see id.* ¶¶ 36, 47, 183 (alleging that New York State and

OPWDD are public entities under the ADA and receive federal funding under the Rehab

Act)). This is sufficient to establish the first two elements of an ADA and Rehab Act

claim. The only issue, therefore, is whether Thomas has pled enough facts to show

OPWDD violated the integration mandate, often referred to as an *Olmstead* claim.

To make out an *Olmstead* claim, a plaintiff must allege, "with sufficient factual

detail to render their claims plausible, that individuals are placed [or remain] in

[residential schools] even though 1) a determination has been made that a particular

individual's needs may be met in a more integrated setting, 2) the individual consents to

reside in a more integrated setting, and 3) the state can reasonably accommodate a

_____

(alterations omitted); *Joseph S.*, 561 F. Supp. 2d at 290 ("[U]nnecessary segregation of individuals with mental illness is discrimination *per se* and a violation of the ADA; no demonstration of differential treatment between individuals with mental illness and those without is required.").

[14] In addition, "to establish a violation under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding." *Henrietta D.*, 331 F.3d at 272. Thomas has alleged that "Defendants are recipients of federal financial assistance" in the Amended Complaint, (Am. Compl. ¶ 183), and Defendants have not argued otherwise. This is sufficient at this stage in the proceedings. *See Schine*, 2017 WL 9485650, at *4 ("[A]lthough a violation of Section 504 . . . requires an additional showing that the defendant has received federal funding, . . . Plaintiff alleges and Defendants do not dispute this factor, rendering the Rehabilitation Act otherwise applicable.").

placement in a more integrated setting." *Joseph S.*, 561 F. Supp. 2d at 290; *accord Mental Disability Law Clinic*, 2008 WL 4104460, at *15. Thomas has sufficiently pled each element.[15]

As to the first element—the appropriateness of an integrated placement—Thomas has alleged his needs can be met in a more integrated setting at the New Horizons facility, OPWDD concurred in that view, and OPWDD has promised him such a placement since early 2017. (Am. Compl. ¶¶ 115-117). Indeed, Defendants concede that "OPWDD. . . found [Thomas] eligible for adult services and community placement." (Defs.' Reply at 10). Such a determination by OPWDD is sufficient to satisfy this first element. *Cf. Schine*, 2017 WL 9485650, at *6 (*Olmstead* does not require . . . that a medical professional endorse Plaintiff's request for relief at the pleadings stage, if ever.") (citing *Joseph S.*, 561 F. Supp. 2d at 289-93); *Murphy*, 260 F. Supp. 3d at 1116 ("Defendants also challenge Plaintiffs' failure to plead that the state's treatment professionals have determined that the individualized housing options they seek are appropriate to meet their needs. The Court does not find this to be a material pleading deficiency in this case.").

---

[15] Defendants attempt to cabin *Olmstead* to "two types of state action," namely "(i) conditioning access to state services on residence in an institution; and (ii) forcing individuals to remain confined in segregated state institutions when such confinement is not medically warranted," and argue that Plaintiffs "have failed to plead facts that plausibly support either theory." (Defs.' Mem. at 21-22; *see also id.* at 22 ("Plaintiffs do not allege that OPWDD imposed any condition, applied any force, or required any confinement of Mr. Thomas[.]") (quotations omitted)). This misreads *Olmstead*, which does not describe the integration mandate in such a limited fashion. To limit *Olmstead* in such a way, and read Thomas's claims out of the ADA and the Rehab Act, would require eliding the central holding of *Olmstead*, namely that "under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated." 527 U.S. at 607.

Defendants contend, nonetheless, that Thomas is actually in the most integrated setting possible at his residential school, because the current location permits him to plan for transition to an adult or more integrated facility. (Defs.' Mem. at 22-23 ("[I]n light of the particular service at issue here—planning for transition, and development of adult residences in the community, for students who are temporarily living in residential schools—residential schools are the most integrated setting appropriate for provision of that service.") (quotations omitted)). This misapprehends Thomas's claim. His alleged *Olmstead* violation is not only that OPWDD failed to *plan* for his community placement; it is also that OPWDD failed to *implement* the plan at a reasonable pace and that such failure has caused him to be housed at Woods when he should in fact be housed at New Horizons. (*See* Am. Compl. ¶¶ 115-118). And schools like Woods are places that are segregated from the community. (*See id.* ¶ 76 ("Residential schools are segregated, regimented and institutional setting[s].")); *id.* ¶ 123 ("Residential schools are defined by the Centers for Medicare and Medicaid Services as institutional settings."); *see also id.* ¶¶ 111-118). In other words, Thomas alleges OPWDD should no longer be in the planning stage of its services and that his placement at Woods is no longer appropriate. Furthermore, Defendants' argument that Thomas is currently in an integrated environment is one crafted by their lawyers—not based on anything in the Amended Complaint—and even if true, would not be a basis to dismiss his claims.

As to the second element—consent—Thomas has alleged his desire to be placed at New Horizons. (Am. Compl. ¶¶ 112-117 ("Mr. Thomas wants to live in a home in the community. . . . Mr. Thomas has sought community placement from OPWDD since 2016. . . . Mr. Thomas is qualified to receive residential support services in the community and would prefer to . . . be served in a more integrated setting[.]")). This

preference is sufficient to infer the necessary consent.  *See, e.g.*, *Mental Disability Law Clinic*, 2008 WL 4104460, at \*15 ("Plaintiff . . . alleges a series of negative consequences flowing from Mary Jo's initial hospitalization, including treatment charges from which, taking all inferences in favor of plaintiff, it can be inferred she would prefer, and therefore consent, to remain in the community[.]  These allegations therefore satisfy the second *Olmstead* prong.") (citation omitted).

As to the third element—the ability to accommodate Thomas's integration—Thomas has alleged "Defendants can reasonably accommodate [Thomas] by providing [him] with community-based services in the most integrated setting" "without any fundamental alteration to New York State's system and services."  (Am. Compl. ¶¶ 155-156).  While these allegations are fairly conclusory, a plaintiff's burden in meeting this element is minimal.  *See, e.g.*, *Mental Disability Law Clinic*, 2008 WL 4104460, at \*15 ("Although plaintiff has not alleged the placement can be reasonably accommodated, taking into account (a) the resources available to the State and (b) the needs of others with mental disabilities, it would be inappropriate to dismiss on these claims on this ground[.]").  Further, from other allegations, it can be inferred that New Horizons is a reasonable accommodation, because OPWDD has promised him a placement there.  (Am. Compl. ¶¶ 115-116).  Defendants have not argued otherwise and have in fact admitted that OPWDD "assigned [Thomas] to the provider New Horizons, and is working to ready that placement for him by Spring 2019."  (Defs.' Reply at 10).[16]

---

[16] Defendants do argue that Thomas has failed to show "OPWDD *could have* provided [him] an appropriate residential placement in the community by age 21" or any sooner than his currently scheduled transition for Spring 2019.  (Defs.' Mem. at 26).  As described above, this misconceives Thomas's alleged injury: he claims he is currently not in the most integrated setting appropriate to his needs, not just that he was delayed

Thomas has thus pled sufficient facts that OPWDD can reasonably accommodate his placement.

Defendants have made a series of other arguments in support of dismissing Thomas's claims against OPWDD. Each misconstrues the Amended Complaint and are meritless. For instance, they argue that Thomas is attempting to force New York State to expand its transition assistance and force transitions from residential facilities "on demand" or "by the age of 21." (Defs' Mem at 25). Thomas is not asking for placement in a more integrated setting on demand or automatically at the age of 21. Thomas's allegations pertain to OPWDD's failure to implement its own plans at a reasonable pace. Nor is Thomas seeking, as Defendants argue, an expansion of services provided by OPWDD or the creation of new services. (*Id.* at 25). Indeed, as noted, Defendants concede that OPWDD can reasonably accommodate Thomas at New Horizons—no new program or service expansion is required.[17]

Defendants also cite *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999), and its progeny, in which the Second Circuit held that the ADA and Rehab Act do not require states to provide new services to the disabled, and only mandates "that a

---

in receiving such placement. As of the date of this Report and Recommendation, Defendants have not told the Court that Thomas was moved to New Horizons.

[17] This argument is better understood as one invoking a "fundamental alteration" defense to the integration mandate, which is that a public entity need not make reasonable modifications if it "can demonstrate [doing so] would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Such a defense, even if meritorious, is not an appropriate basis to dismiss a complaint. *Joseph S.*, 561 F. Supp. 2d at 293 ("Defendants argue that the broad relief that plaintiffs seek here would require a fundamental alteration to the state's mental health policies and practices. Nonetheless, it would be inappropriate to dismiss plaintiffs' ADA and Section 504 claims for this reason at this stage of the litigation because defendants bear the burden of establishing fundamental alteration as a defense.") (quotations and citations omitted).

particular service provided to some not be denied to disabled people." *Id.* at 618.
*Rodriguez* is inapposite in the context of an integration mandate claim, where
unnecessary segregation from the community—and not reasonable accommodation—is
the discrimination at issue. *See, e.g.*, *Mental Disability Law Clinic*, 2008 WL 4104460,
at *16 ("[T]he cited cases concern the ADA's reasonable accommodation and equal
access requirements and not the integration mandate.") (rejecting reliance on
*Rodriguez* for the proposition that plaintiff's integration mandate claims should be
dismissed because the ADA does not expand rights); *Joseph S.*, 561 F. Supp. 2d at 292
n.9 ("The cases cited by defendants in their memorandum and letter are inapposite as
they interpret the ADA's reasonable accommodation and equal access requirements and
not the integration mandate.") (citation omitted) (rejecting reliance on *Rodriguez*);
*Martin v. Taft*, 222 F. Supp. 2d 940, 974 (S.D. Ohio 2002) (rejecting reliance on
*Rodriguez*).[18]

Accordingly, Thomas has stated an *Olmstead* claim against OPWDD under the
Rehab Act and the ADA.

\*          \*          \*

Thomas has also brought a separate claim that he labels as a failure to meet the
reasonable modification mandate.  (*See* Am. Compl. ¶¶ 157-172 (Count II) ("Defendants
have discriminated against Plaintiff Evan Thomas and the Adults Awaiting Discharge by
failing to make reasonable modifications to polices that force individuals to live in
institutional settings[.]")).  It is unclear whether a failure to make a reasonable

---

[18] *Forziano v. Independent Group Home Living Program, Inc.*, No. 13-CV-0370,
2014 WL 1277912 (E.D.N.Y. Mar. 26, 2014), *aff'd*, 613 F. App'x 15 (2d Cir. 2015), also
cited by Defendants, did not involve the ADA or Rehab Act's integration mandate and is
therefore inapplicable.  *Id.* at *7-10.

modification is properly understood as a cause of action on its own or an avenue for relief for violation of the integration mandate. *Compare Schine*, 2017 WL 1232530, at *3 ("[A] state's failure to make a reasonable modification to its plan or provision of services *in order to adhere to the integration mandate* may be excused where the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.") (quotations omitted) (emphasis added), *with Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 317 (E.D.N.Y. 2009) ("An *Olmstead* claim concerns a public entity's obligation to make reasonable modifications to its service system to enable individuals with disabilities to receive services in the most integrated setting appropriate to their needs."); *id.* at 333 ("States are required to make reasonable modifications to comply with the integration mandate, but they need not take an action that would constitute a fundamental alteration.") (quotations omitted).[19]

Defendants have failed to argue this issue; in fact, Defendants concede that they are arguing that Thomas has not pled enough facts to state a claim, not that Thomas could never state a legally cognizable claim. (*See* Jan. 30 Tr. at 26:21-24 ("The Court: . . . You're not saying that for Mr. Thomas as a matter of law he could not state a claim? [Defendants' Counsel]: We are not saying that.")). The Court does not raise *sua sponte*

---

[19] It is also unclear whether Thomas could recover the compensatory damages he seeks, because "a plaintiff must prove that the defendant exhibited 'deliberate indifference' as to the 'strong likelihood' that its actions were unlawful under the statutes" in order to "recover compensatory damages under the ADA or the Rehabilitation Act." *Feltenstein v. City of New Rochelle*, 254 F. Supp. 3d 647, 657 (S.D.N.Y. 2017) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)); *see also Frank*, 84 F. Supp. 3d at 186-87. Defendants do not advance any arguments about damages.

any issues pertaining to whether Thomas's claimed violation of the reasonable modification mandate should be dismissed.

   C.   Sufficiency of Claims against Delaney, Cuomo, and New York State

   Defendants make a series of arguments about the remaining parties, namely that: (1) the Amended Complaint improperly groups Defendants together and "fails to articulate any particular role played by any of the individual Defendants," (Defs.' Mem. at 28-29); (2) Cuomo and Delaney are improper defendants under the ADA and Rehab Act, even in their official capacities, (*id.* at 30); and (3) the claims against Cuomo, Delaney, and New York State "are duplicative of [Plaintiff's] claims against OPWDD," (*id.*).  Defendants are correct that Thomas's claims against Cuomo, Delaney, and New York State are duplicative or otherwise not alleged with sufficient particularity.

   As to Delaney, Acting Commissioner of OPWDD, it is clear that any claim against her is the same as a claim against OPWDD itself.  "[W]here (as here) a discrimination claim has already been asserted against an entity, it is redundant to assert an additional discrimination claim against the entity's agent in his or her official capacity, because the latter claim is the functional equivalent of a claim against the entity."  *Boyd v. Broome Cmty. Coll.*, No. 14-CV-0397, 2015 WL 6962498, at *6 (N.D.N.Y. Nov. 10, 2015) (dismissing federal employment discrimination claims (including under the ADA and Rehab Act) against a president and board of trustees of a community college as duplicative of those against the community college).  The claims against Delaney are alleged against her only in her official capacity and, therefore, are redundant and must be dismissed.  *See, e.g.*, *Scalercio-Isenberg v. Port Auth. of N.Y.*, No. 16-CV-8494, 2018 WL 1633767, at *6 (S.D.N.Y. Mar. 31, 2018) ("Because Defendant Foye in his official capacity acts as a representative of the Port Authority, which is also named as a

48

defendant here, there is no reason to permit duplicate claims to proceed against both parties.  Therefore, I dismiss Plaintiff's official capacity claims against Defendant Foye.") (citation omitted); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 408 (E.D.N.Y. 2010) ("The Court . . . dismisses with prejudice plaintiff's ADA and Rehab[ilitation] Act claims against the individual RFCUNY employees in their official capacities, because they are wholly redundant to plaintiff's claims against RFCUNY itself.") (collecting cases), *modified*, (July 2, 2010); *Hallett v. N.Y. State Dept. of Corr. Servs.,* 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000) ("Because plaintiff is able to assert his ADA and Rehabilitation Act claims against DOCS directly, I find that there is no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against the individual defendants in their official capacities.").

The claims against Cuomo and New York State should also be dismissed.  The Amended Complaint does not "outline[ ] the different role that each Defendant plays in the violations of the ADA and Rehabilitation Act."  (Pls.' Mem. at 24).  The Amended Complaint only references Cuomo and New York State in describing the structure of the government, *i.e.*, that New York State is a public entity that operates OPWDD and that Cuomo, as the Governor of New York, is responsible for appointing the Acting Commissioner of OPWDD and for the branch of government that includes OPWDD. (*See* Am. Compl. ¶¶ 36-45).  It does not, for example, allege any particular actions Cuomo or New York State have taken pertaining to Plaintiff's claims outside of those taken by OPWDD.  Nor does it explain how any relief sought could be implemented by anyone other than OPWDD.  In fact, the Amended Complaint only makes allegations about what *OPWDD has done* while Cuomo was in office, (*see, e.g.*, *id.* ¶ 43 ("During Governor Cuomo's tenure, OPWDD has taken, and continues to take, action that

Plaintiffs complain of in this lawsuit.")), repeats its allegations about the structure of New York's government, (*see, e.g.*, *id.* ¶ 171 ("Cuomo [is] responsible for the operation of public entities covered by Title II of the ADA.")), or groups all Defendants together in a way that would make it impossible for each Defendant to understand what conduct he is alleged to have taken, (*see, e.g.*, *id.* ¶ 164 ("Defendants unnecessarily segregate Plaintiff Evan Thomas and the Adults Awaiting Discharge."); *id.* ¶ 185 ("Defendants have discriminated against Plaintiff Evan Thomas and the Adults Awaiting Discharge by forcing them to live in these institutional settings[.]")).

Such wholly conclusory allegations against Cuomo and New York State are insufficient to state a claim against them. *See Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, No. 12-CV-2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("The remaining key facts pled in the SAC are lumped together and thus do not afford each defendant adequate notice of the factual allegations it faces.  This failure to isolate the key allegations against each defendant supports dismissal under the standards set forth in *Twombly* and *Iqbal*.  Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants.") (quotations omitted), *aff'd*, 530 F. App'x 19 (2d Cir. 2013); *McCabe v. Caribbean Cruise Line, Inc.*, No. 13-CV-6131, 2014 WL 3014874, at *2 (E.D.N.Y. July 3, 2014) (dismissing claims against some defendants for failing to differentiate their conduct but allowing claim against one defendant to proceed).[20]

---

[20] Because the Court recommends dismissal of claims against Cuomo, Delaney, and New York State on these bases, it does not reach Defendants' other arguments about the claims against these Defendants.

CONCLUSION

For the reasons described above, the Court recommends:

1.   Defendants' motion to dismiss for lack of standing be granted with respect to
     DRNY.  This dismissal should be without prejudice.  *See Carter*, 822 F.3d at
     54-55 ("[W]here a complaint is dismissed for lack of Article III standing, the
     dismissal must be without prejudice, rather than with prejudice.  Such a
     dismissal is one for lack of subject matter jurisdiction, and without
     jurisdiction, the district court lacks the power to adjudicate the merits of the
     case[.]") (citations omitted).

2.   Defendants' motion to dismiss for lack of standing with respect to Thomas's
     claims be denied, except as to the requested injunctive relief requiring
     OPWDD to begin discharge planning at age 16.  *See supra* pp. 35-36.  This
     dismissal should be without prejudice.  *See Carter*, 822 F.3d at 54-55.

3.   Defendants' motion to dismiss with respect to Thomas's claims against
     OPWDD be denied; and

4.   Defendants' motion to dismiss with respect to Thomas's claims against
     Delaney, Cuomo, and New York State be granted.  Such dismissal should be
     without prejudice.

Any objections to the Report and Recommendation above must be filed with the
Clerk of the Court within 14 days of service of this report.  Failure to file objections
within the specified time waives the right to appeal any judgment or order entered by
the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C.
§ 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d

Cir. 2008) ("[F]ailure to object timely to a magistrate[ ] [judge's] report operates as a waiver of any further judicial review of the magistrate[ ] [judge's] decision.").

SO ORDERED.

*/s/ Sanket J. Bulsara* June 14, 2019
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York