UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DISABILITY RIGHTS NEW YORK, *et al.*,

                              Plaintiffs,                **MEMORANDUM AND ORDER**

       -against-                          17-CV-6965 (RRM) (MMH)

NEW YORK STATE, *et al.*,

                              Defendants.
-------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

      In a report and recommendation dated June 14, 2019 (the "R&R"), Magistrate Judge

Sanket J. Bulsara recommended granting defendants' motion to dismiss plaintiff Disability

Rights New York ("DRNY") for lack of standing to bring this action on behalf of adults with

disabilities who continue to reside in residential schools while awaiting placement into integrated

community settings.  DRNY timely filed objections to the R&R, principally arguing that the

R&R failed to explicitly address DRNY's representational standing theory and incorrectly stated

that DRNY had disavowed associational standing.  The Court has reviewed the portions of the

R&R to which DRNY objects de novo and, for the reasons set forth below, rejects DRNY's

arguments and accepts Judge Bulsara's recommendation that DRNY be dismissed without

prejudice for lack of standing.

## BACKGROUND

      The following facts are drawn from the Court's docket sheet and plaintiffs' amended

complaint, the allegations of which are assumed to be true for purposes of this Memorandum and

Order.  Disability Advocates, Inc. ("DAI"), is a nonprofit corporation that has been doing

business under the name DRNY since May 7, 2013, when then-Governor Andrew M. Cuomo

designated DAI as New York State's Protection and Advocacy ("P&A") system.  (Am. Compl.

(Doc. No. 28) at ¶¶ 17–18.)  For about 25 years prior to that designation, DAI had been providing P&A services pursuant to a contract with the New York State Commission on Quality Care ("CQC"), which was New York's P&A system from 1976 to 2013.  (*Id.* at ¶¶ 15–16.)

As discussed in more detail below, P&A systems exist because various federal laws condition federal funding on the recipient state's having a P&A system to protect and advocate the rights of individuals with developmental disabilities.  (*Id.* at ¶ 5.)  These federal laws require that P&A systems have, among other things, authority to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with developmental disabilities.  (*Id.* at ¶ 7.)

On November 30, 2017, DRNY commenced this action against New York State, then-Governor Cuomo, the New York State Office for People with Developmental Disabilities ("OPWDD"), and its then-Acting Commissioner, Kerry A. Delaney, seeking declaratory and injunctive relief on behalf of disabled adults who continue to be housed in residential schools after completing their education or reaching age 21 (the "Adults").  (Complaint (Doc. No. 1).) The complaint alleged that OPWDD is responsible for developing and executing a discharge plan that would transition the Adults, who were institutionalized in residential schools as children, into integrated community settings.  (*Id.* at ¶¶ 32–34.)  At the time the complaint was filed, 92 Adults had been waiting over a year to be transitioned and another five were still waiting for OPWDD to develop their discharge plan.  (*Id.* at ¶¶ 35–45.)

The complaint alleged three causes of action:  that defendants 1) discriminated against the Adults in violation of Title II of the Americans with Disabilities Act ("ADA"), 2) violated Title II's reasonable modification mandate by failing to modify their policies, practices, or procedures to avoid the discrimination alleged in the first cause of action, and 3) violated Section

504 of the Rehabilitation Act ("Section 504") by forcing the Adults to continue to live in the residential schools.  The Complaint demanded a court order declaring that defendants were in violation of the ADA and Section 504 and granting certain injunctive relief.

In June 2019, DRNY amended its complaint to add Evan Thomas, a 22-year-old Adult who had yet to receive a discharge plan, as a plaintiff.  The amended complaint alleged that Thomas was bringing this action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of himself and as the representative of a class consisting of "all Adults … who seek community placement but who remain unlawfully institutionalized in residential schools due to Defendants' conduct."  (Am. Compl. at ¶ 73.)  The amended pleading further alleged that DRNY was suing on behalf of Adults who do not oppose placement in the community "[p]ursuant to the authority vested in it by Congress to litigate claims of abuse, neglect, and rights violations on behalf of individuals with disabilities," (*id.* at ¶ 21), and specifically alleged that DRNY was bringing its claims "pursuant to its representational standing," (*id.* at ¶ 22).

The amended complaint alleged the same three causes of action as the original pleading and demanded the same declaratory and injunctive relief.  However, the amended complaint also demanded that Thomas and the class members be awarded compensatory damages for their unnecessary institutionalization.

Defendants' Motion

In December 2018, defendants filed a motion to dismiss the amended complaint pursuant to Rules 8(a), 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Defendants' Notice of Motion (Doc. No. 39) at 1.)  Defendants' Memorandum of Law in Support of their Motion ("Defendants' Memo") (Doc. No. 40) raises three arguments, the first of which contends

that plaintiffs failed to plead facts sufficient to establish that either DRNY or Thomas has

standing to bring this lawsuit.  The second and third arguments relate to Thomas's claims.  Since

Thomas is no longer a party to this action and since the objections at issue in this Memorandum

and Order relate only to the issue of whether DRNY has standing to bring this case, the Court

need discuss only the portion of the first argument that relates to DRNY.

In arguing to dismiss DRNY for lack of standing, defendants assume, but do not

explicitly state, that DRNY, being an organization, needs to establish either organizational or

associational standing.  Defendants imply that DRNY is not seeking to establish organizational

standing, noting that "DRNY pleads no injury to itself and seeks no relief in its own name."

(Defendants' Memo (Doc. No. 40) at 7.)  Defendants then focus on whether DRNY has pleaded

facts sufficient to establish associational standing under the three-prong test set forth in *Hunt v.*

*Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977), arguing that DRNY failed to

allege facts sufficient to make out the first and third prongs.  (Defendants' Memo at 9–12.)[1]

Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss ("Plaintiffs'

Opposition") emphasizes that DRNY is not relying on associational standing and argues that

*Hunt* is inapplicable.  (Plaintiffs' Opposition (Doc. No. 42) at 12.)  Rather, DRNY argues that

Congress granted P&A systems representational standing.  (Plaintiffs' Opposition at 9.)  Citing

other federal statutes that permit third-parties to sue on behalf of individuals whose statutory

rights are violated, DRNY argues that Congress did the same here by enacting legislation that

---

[1] Although the R&R asserts that defendants' challenge to DRNY's standing does not allege failure to meet
constitutional standing requirements but only "concerns limits of [a] … prudential barrier—the third-party standing
bar," (R&R at 9), defendants' argument that DRNY has not alleged facts sufficient to establish the first prong of the
three-prong test set forth in *Hunt* concerns a constitutional requirement.  *See United Food and Commercial Workers
Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554–55 (1996).

required the creation of P&A systems authorized to pursue legal remedies on behalf of disabled individuals. (*Id.* at 9–10.)

The Court referred defendants' motion to dismiss to Judge Bulsara for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). On June 14, 2019, Judge Bulsara issued the R&R, which recommends, among other things, that the motion to dismiss DRNY for lack of standing be granted.[2] The R&R accepts as true the allegation that DRNY is New York State's P&A system and is statutorily authorized to "litigate claims of abuse, neglect, and rights violations on behalf of individuals with disabilities." (R&R at 2 (quoting Am. Compl. at ¶ 21)). However, the R&R rejects DRNY's contention that it has standing by virtue of this statutory authorization alone. (R&R at 2, 10–11.) Rather, the R&R implies that DRNY needs to establish associational standing by alleging facts that would satisfy *Hunt*'s three-pronged analysis. (R&R at 16.) The R&R finds that, instead of relying on cases that found P&A systems to have the "indicia of membership" necessary to make out associational standing, DRNY has "disavowed … any attempt to show that it has associational standing," and has not alleged facts necessary to establish its standing to sue. (*Id.* at 14.)

On June 28, 2019, DRNY filed objections to the R&R (the "Objections"), which contest two of Judge Bulsara's findings. First, DRNY asserts that the magistrate judge "erred by concluding that DRNY disavowed associational standing simply because it chose to not assert it" in this case. (Objections (Doc. No. 53) at 8.) Second, DRNY argues that Judge Bulsara erred "by finding that DRNY did not have representational standing pursuant to specific congressional authorization." (*Id.* at 3.)

---

[2] The R&R's other recommendations relate to defendants' motion to dismiss Thomas and his claims. Since Thomas was not named as a party in plaintiffs Second Amended Complaint (Doc. No 68) and is no longer a party to this action, the Court need not discuss these recommendations.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 72 provides that "[w]ithin 14 days after being served with a copy of [a magistrate judge's report and recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). The district judge must then "determine de novo any part of the magistrate judge's disposition that has been properly objected to." *Id.*, 72(b)(3). De novo review is required only with respect to those portions of the report and recommendation to which specific written objections are made. *See Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022). After completing this review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).[3]

Defendants' motion to dismiss DRNY for lack of standing is brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Defendants' Memo at 6.) The standing issue "may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). "[T]he stage at which, and the manner in which, the issue is raised affect (a) the obligation of the plaintiff to respond, (b) the manner in which the district court considers the challenge, and (c) the standard of review applicable to the district court's decision." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

When, as here, a "Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "Pleading"), the

---

[3] Those portions of a report and recommendation to which there are no specific reasoned objections are ordinarily reviewed for clear error. *Lima v. Napoli*, No. 19-CV-1699 (JMA) (ST), 2023 WL 2731689, at *1 (E.D.N.Y. Mar. 31, 2023) (citing *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 51 (E.D.N.Y. 2008)). This review is not required here, however, since the recommendations to which no objections have been filed relate to plaintiff Thomas, who is no longer a party to this case.

plaintiff has no evidentiary burden." *Carter*, 822 F.3d at 56.  In reviewing a facial attack to the

court's jurisdiction, the Court draws all facts from the Pleading, the allegations of which are

assumed to be true unless contradicted by more specific allegations or documentary evidence,

and construes all reasonable inferences to be drawn from those factual allegations in plaintiff's

favor.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  "The

task of the district court is to determine whether the Pleading 'allege[s] facts that affirmatively

and plausibly suggest that [the plaintiff] has standing to sue.'"  *Carter*, 822 F.3d at 56 (quoting

*Amidax Trading Grp.*, 671 F.3d at 145) (alterations in *Carter*).

    The party invoking federal jurisdiction bears the burden of establishing the elements of

Article III standing regardless of when the issue is raised.  *Id.*  "Since they are not mere pleading

requirements but rather an indispensable part of the plaintiff's case, each element must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof,

*i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "At the pleading stage, general factual

allegations of injury resulting from the defendant's conduct may suffice, for on a motion to

dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are

necessary to support the claim.'"  *Id.* (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871,

889 (1990) (second alteration in *Defenders of Wildlife*).

## DISCUSSION

### A. Constitutional and Prudential Limitations on Standing

    "In essence the question of standing is whether the litigant is entitled to have the court

decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498

(1975).  "This inquiry involves both constitutional limitations on federal-court jurisdiction and

prudential limitations on its exercise." *Id.*  The constitutional limitations arise from Article III,

Section 2, of the United States Constitution, which restricts "the jurisdiction of the federal courts

to the resolution of 'cases' and 'controversies.'" *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62

(2d Cir. 2012) (internal quotation marks and citations omitted).  In contrast, the prudential

limitations are "judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove*

*Unified School Dist. v. Newdow*, 542 U.S. 1, 11–12 (2004) (quoting *Allen v. Wright*, 468 U.S.

737, 751 (1984)).  While the Supreme Court "has kept these two strands separate," *United States*

*v. Windsor*, 570 U.S. 744, 757 (2013), it concedes that "it has not always been clear in [its]

opinions … whether particular features of the 'standing' requirement have been required by Art.

III *ex proprio vigore*, or whether they are requirements that the Court itself has erected and

which were not compelled by the language of the Constitution." *Valley Forge Christian Coll. v.*

*Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) (citing *Flast*

*v. Cohen*, 392 U.S. 83, 97 (1968)).

The Supreme Court has "established that the irreducible constitutional minimum of

standing contains three elements." *Lujan*, 504 U.S. at 560.

> First, the plaintiff must have suffered an injury in fact—an
> invasion of a legally protected interest which is (a) concrete and
> particularized, and (b) actual or imminent, not conjectural or
> hypothetical. Second, there must be a causal connection between
> the injury and the conduct complained of—the injury has to be
> fairly … trace[able] to the challenged action of the defendant, and
> not … th[e] result [of] the independent action of some third party
> not before the court. Third, it must be likely, as opposed to merely
> speculative, that the injury will be redressed by a favorable
> decision.

*Windsor*, 570 U.S. at 757 (internal quotation marks and citation omitted; alterations in original).

"If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their

claim." *Mahon*, 683 F.3d at 62 (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

With respect to the first of the three elements, the "actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth*, 422 U.S. at 500 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)). Thus, "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules." *Id.* at 501. "Nevertheless, some injury-in-fact must be shown to satisfy constitutional requirements, for Congress cannot waive the constitutional minimum of injury-in-fact." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993).

The judicially imposed prudential limitations are "designed to protect the courts from 'decid[ing] abstract questions of wide public significance even [when] other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.'" *Windsor*, 570 U.S. at 757 (quoting *Warth*, 422 U.S. at 500) (alterations in *Windsor*). These limitations are "not exhaustively defined," but encompass "at least three broad principles: 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Elk Grove Unified School Dist.*, 542 U.S. at 12). These prudential limitations supplement the constitutional requirements, *see United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996), and are "not derived from Article III." *Lexmark*, 572 U.S. at 126. "Unlike the

constitutional requirements, … prudential limits on the exercise of federal jurisdiction may be abrogated by Congress." *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1108–09 (9th Cir. 2003) (citing *United Food*, 517 U.S. at 551, 555–58). "When Congress has extended standing under a statute to the limits of Article III, 'the courts … lack the authority to create prudential barriers to standing in suits brought under that [statute].'" *United States ex rel. Kreindler & Kreindler*, 985 F.2d at 1154 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

The only prudential limitation at issue here is the rule prohibiting a litigant from raising a third party's rights. "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (citing *Department of Labor v. Triplett*, 494 U.S. 715, 720 (1990)). However, the Supreme Court has recognized a limited exception to this prudential limitation where "three important criteria are satisfied." *Id.* at 410–11. First, the litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute." *Id.* at 411 (quoting *Singleton v. Wulff*, 428 U.S. 106, 112 (1976)). Second, "the litigant must have a close relation to the third party." *Id.* (citing *Singleton*, 428 U.S. at 113–14). Third, "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* (citing *Singleton*, 428 U.S. at 115–16).

B. <u>Organizational and Associational Standing</u>

"An organization can have standing to sue in one of two ways." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). First, an organization can "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. "Under this theory of 'organizational' standing, the organization is just another person—albeit a

10

legal person—seeking to vindicate a right." *New York Civil Liberties Union*, 684 F.3d at 294. Accordingly, to make out organizational standing, an organization must "meet[ ] the same standing test that applies to individuals … [by] show[ing] actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (quoting *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)) (alterations in *Giuliani*).

Second, an organization "may sue to redress its members' injuries, even without a showing of injury to the association itself." *United Food,* 517 U.S. at 552.  As the Second Circuit noted in *New York Civil Liberties Union*, 684 F.3d at 294, this type of standing is sometimes called "representational" standing, *see Warth*, 422 U.S. at 511, and sometimes called "associational" standing, *see Giuliani*, 143 F.3d at 649.  Sometimes associational standing is called a "strand" of representational standing.  *United Food,* 517 U.S. at 557.  For ease of reference, the Court will hereafter refer to this type of standing as "associational standing."

To make out associational standing, an organization must establish "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.  "[T]he test's first requirement, that at least one of the organization's members would have standing to sue on his own, is grounded on Article III as an element of 'the constitutional requirement of a case or controversy.'" *United Food*, 517 U.S. at 554–55 (quoting *Warth*, 422 U.S. at 511).  The second requirement, like the first, is also a constitutional limitation.  *See DAI v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012).  Only "the associational standing test's third prong is a prudential one," *United Food*, 517 U.S. at 555, and, accordingly,

11

the only one of the three requirements "that may be abrogated by Congress," *DAI*, 675 F.3d at 157.

Although the first prong of the *Hunt* test requires a court to assess whether an organization's members have standing, it is well established that "non-membership organizations may sue in a representative capacity when they 'function [ ] effectively as a membership organization.'" *DAI*, 675 F.3d at 157 (quoting *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 196 (2d Cir. 2000)) (alteration in *DAI*).  Indeed, *Hunt* itself involved a non-membership organization:  the Washington State Apple Advertising Commission, a state agency whose statutory charge was to promote Washington's apple industry.  The Supreme Court noted that Washington's apple growers and dealers were "not 'members' of the Commission in the traditional trade association sense," but nonetheless "possess[ed] all of the indicia of membership in an organization."  *Hunt*, 432 U.S. at 344.  The Court noted that the growers and dealers "alone elect the members of the Commission; … alone may serve on the Commission; … [and] alone finance its activities … through assessments levied upon them."  *Id.* at 344–45.  The Court concluded that "[i]n a very real sense, … the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests."  *Id.* at 345.

C.  P&A Systems

According the amended complaint, the allegations of which are assumed to be true for purposes of this Memorandum and Order, DRNY is New York State's P&A system.  (Am. Compl. at ¶¶17–18.)  Accordingly, in order to analyze whether DRNY has standing in this case, it is necessary to discuss the nature of P&A systems and two statutes that require them:  the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et*

*seq.*, and the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*

The origins of the P&A system can be traced to the Developmentally Disabled Assistance and Bill of Rights Act (the "Original DD Act"), which was enacted in 1975. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 n.1 (1999) (citing 89 Stat. 486, 42 U.S.C. § 6001 *et seq.* (1976 ed.)). The Supreme Court described this Act as "a federal-state grant program" through which the federal government provided "financial assistance to participating states to assist in creating programs to care for and treat the developmentally disabled." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 11 (1981). A state's participation in the program was voluntary and conditioned on the state's compliance with certain requirements. *Id.* One of those requirements was the creation of a P&A system to protect and advocate the rights of developmentally disabled persons which has the authority to pursue legal, administrative and other remedies on their behalf. *See* 42 U.S.C. § 6012 (repealed & replaced by Pub. L. No. 106-402, Title I, §§ 141–45, Oct. 30, 2000, 114 Stat. 1712–18), codified as amended at 42 U.S.C. §§ 15041–45 (2006)).

Since 1975, "Congress has periodically authorized the P&A [system]s to receive or seek funding for other P&A or P&A-related activities." Robert L. Burgdorf, Jr., "Long-Overdue Reform of D.C.'s Antediluvian Developmental Disabilities Law: From Forest Haven to the 21st Century," 13 U.D.C. L. Rev. 249, 267 (2010). As of 2010, there were "eight different P&A programs." *Id.* The parties' motion papers mention one of these programs: the Protection and Advocacy for Mentally Ill Individuals Act of 1986 ("PAMII"), the short title of which was changed in 2000 to the Protection and Advocacy for Individuals with Mental Illness Act

("PAIMI").[4]  This legislation "expanded the P&A [system]s' responsibilities to include

protecting and advocating for the rights of people with mental illness and of investigating reports

of abuse and neglect in facilities that care for or treat individuals with mental illness." *Id.*

In 2000, the Original DD Act was repealed and incorporated into the Developmental

Disabilities Assistance and Bill of Rights Act of 2000 (the "DD Act"), 42 U.S.C. § 15001 *et  seq.*

Although this resulted "in a relocation of the codification of [the Original DD Act's] provisions,

… most of its provisions were retained," as was "the core of the developmental disability

statutory scheme."  Burgdorf, 13 U.D.C. L. Rev. at 258–59.  Like the Original DD Act, the DD

Act offers the States federal money, conditioned on the State establishing a P&A system "to

protect and advocate the rights of individuals with developmental disabilities."  42 U.S.C. §

15043(a)(1).

"[I]n addition to pressing its own rights, a P & A system may 'pursue administrative,

legal, and other remedies on behalf of' those it protects."  *Virginia Off. for Prot. & Advoc. v.*

*Stewart*, 563 U.S. 247, 251 (2011) (citing 42 U.S.C. § 10805(a)(1)(C)); *see* 42 U.S.C. §

15044(b).  Under the DD and PAIMI Acts, a P&A system must "have the authority to investigate

incidents of abuse and neglect … if the incidents are reported to the system or if there is probable

cause to believe that the incidents occurred."  42 U.S.C. §§ 15043(a)(2)(B), 10805(a)(1)(A).  The

P&A system must, subject to certain statutory requirements, be given access to "all records" of

individuals who may have been abused, *see id.* §§ 15043(a)(2)(I)(iii)(II), 10805(a)(4)(B)(iii), and

"other records that are relevant to conducting an investigation," *id.* § 15043(a)(2)(J)(i).  The

---

[4] PAMII was amended in 1991 to substitute the term "individuals with mental illness" for the term "mentally ill individuals" wherever it appeared in the Act.  *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 233 n.1 (2d Cir. 2006) (citing Pub. L. No. 102–173, § 10(2), 105 Stat. 1217, 1219 (Nov. 27, 1991)).  The short title, however, remained unchanged until 2000, when Congress amended it.  The provisions relating to the P&A system requirement were not materially altered by this or any other amendments of the Act.

P&A system must also have authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of" its charges. *Id.* § 15043(a)(2)(A)(i); *see id.* § 10805(a)(1)(B).

A State can appoint either a state agency or a private nonprofit entity as its P&A system. *See* 42 U.S.C. §§ 15044(a), 10805(c)(1)(B). As of 2011, all 50 states were accepting funds under these statutes, *see Stewart*, 563 U.S. at 250, but only eight had designated a government entity as their P&A system, *see id.* at 251. Regardless of whether the P&A system is a state agency or a nonprofit, the P&A system is not financed by the State but "receives separate federal funds, paid to it directly." *Id.* at 250 (citing 42 U.S.C. § 15042(a) and (b)). It must also "have certain structural features that ensure its independence from the State's government." *Id.* at 251

Both the DD Act and PAIMI Act contain specific requirements relating to the governance of a P&A system. If the P&A system has a multimember governing board, that board must be composed of members "who broadly represent or are knowledgeable about the needs of the individuals served by the system." 42 U.S.C. § 15044(a)(1)(A); *see* 42 U.S.C. § 10805(c)(1)(B)(i). PAIMI dictates that the phrase "members who broadly represent or are knowledgeable about the needs" of those "served by the system" be "construed to include individuals who have received or are receiving mental health services and family members of such individuals." *Id.* § 10805(c)(1)(B). The DD Act requires that "a majority of the members of the board shall be … (i) individuals with disabilities, including individuals with developmental disabilities, who are eligible for services, or have received or are receiving services through the system; or (ii) parents, family members, guardians, advocates, or authorized representatives of individuals referred to in clause (i)." *Id.* § 15044(a)(1)(B). Furthermore, if the state authorizes its chief executive officer to appoint members of the board, no more than a third

15

of the board members of the board may be appointed by the chief executive officer.  *Id.* §

15044(a)(1)(C)(2).

The PAIMI Act requires that a P&A system establish an advisory council which must

"include attorneys, mental health professionals, individuals from the public who are

knowledgeable about mental illness, a provider of mental health services, individuals who have

received or are receiving mental health services, and family members of such individuals …."

*Id.* § 10805(a)(6)(B).  Indeed, the Act requires that "at least 60 percent the membership of [the

advisory board] … shall be comprised of individuals who have received or are receiving mental

health services or who are family members of such individuals."  *Id.*  In addition, the Act

requires that the advisory board "be chaired by an individual who has received or who is

receiving mental health services or is a family member of such an individual."  *Id.* §

10805(a)(6)(C).

    D.  P&A Systems' Standing

During the 25 years the Original DD Act remained in effect, a dispute arose as to whether

P&A systems had standing to bring suit on behalf of persons with disabilities without

establishing injury to itself.  Several district courts—including at least three in this Circuit—

reasoned, without much analysis, that P&A systems must have standing to effectuate the

purposes of the legislation that created them.  For example, in *Goldstein v. Coughlin*, 83 F.R.D.

613 (W.D.N.Y. 1979), Chief Judge Curtin held that New York's P&A system—then, Protection

and Advocacy System for Developmental Disabilities, Inc. ("PASDD")—had standing to sue

Craig Developmental Center, an institution operated by the New York State Office of Mental

Retardation and Developmental Disabilities, over its failure to provide any habilitative services,

psychological or psychiatric counseling, or other services to one of its residents.  Judge Curtin

noted that the Original DD Act required a State to have a P&A system with the authority to pursue legal, administrative and other remedies to protect and advocate the rights of "retarded persons." *Id.* at 614. He then reasoned: "Given the Congressional purpose to provide retarded persons with legal representation, … and given PASDD's responsibilities as the designated advocacy system for this state, PASDD need show no injury to itself in order to have standing in this action." *Id.* (citing *Naughton v. Bevilacqua*, 458 F. Supp. 610, 616, n.3 (D.R.I. 1978)).

Over the next five years, at least two other district courts in this Circuit followed the reasoning in *Goldstein* in holding that DAI had standing to sue in its own name without showing injury to itself. In *Rubenstein v. Benedictine Hosp.*, 790 F. Supp. 396 (N.D.N.Y. 1992), DAI brought a putative civil rights class action lawsuit against a hospital and an emergency room doctor that had involuntarily committed patients who were not posing a substantial risk of danger to themselves or others. Both the doctor and the hospital argued that DAI, then a contractor employed by New York's P&A system, could only serve as an advocate, not a party, and lacked standing because it could not assert that it personally suffered an "injury in fact." DAI argued that it had standing by virtue of its status as part of the P&A system mandated by the PAMII (now PAIMI) Act, the purposes of which were "to ensure that the rights of mentally ill individuals are protected" and "to assist States to establish and operate a protection and advocacy system for mentally ill individuals" to effectuate such protection through advocacy and investigation. 42 U.S.C. § 10801(b)(1) & (2).

District Judge Cholakis agreed with DAI. The judge held that the PAMII clearly conferred upon a P&A system "the right to 'pursue … legal remedies to ensure the protection of mentally ill individuals who are receiving care or treatment in the State,'" and reasoned that that right would extend to entities with which the P&A system contracted. *Rubenstein*, 790 F. Supp.

17

at 408 (quoting 42 U.S.C. § 10805(a)(1)(B)).  Noting that the statutory language of the PAMII

Act was very similar to that of the Original DD Act, Judge Cholakis essentially adopted the

reasoning of *Goldstein*, holding:  "Given the broad remedial purposes of the [PAMII] Act, and

the statutory language apparently conferring a right upon entities such as DAI to pursue legal

remedies such as those sought through the present lawsuit, the defendants' motion to dismiss

DAI for lack of standing is denied."  *Id.* at 409.

Two years later, in *Trautz v. Weisman*, 846 F. Supp. 1160 (S.D.N.Y. 1994), District

Judge Goettel addressed the issue of whether DAI had standing to sue for injunctive relief

against an adult care facility that allegedly exposed mentally ill residents to filthy, dangerous,

and degrading conditions.  Although it was still a contractor to the CQC, which was then New

York's P&A system, DAI argued that the P&A system's statutory authorization to "pursue

administrative, legal, and other appropriate remedies to ensure the protection of mentally ill

individuals who are receiving care or treatment in the State" conferred standing on DAI to seek

injunctive relief.  *Id.* at 1162 (quoting 42 U.S.C. § 10805(a)(1)(B)).  Judge Goettel agreed.  The

judge noted that *Rubenstein* found that the PAMII Act "clearly conferred upon a [P&A] system,

… [CQC], the right to pursue legal remedies for the protection of mentally ill individuals," and

"further reasoned that the right to pursue legal remedies also flowed to the entities with which

the Commission contracts, thus giving DAI standing."  *Id.* at 1162.  Judge Goettel concurred

with the *Rubenstein* Court, holding that "if Congress merely intended for state systems to act as

advocates on behalf of mentally individuals, it would not have included [42 U.S.C. §

10805](a)(1)(B) in the statute in addition to [42 U.S.C. § 10805](a)(1)(C)," which authorized a

P&A system to "pursue administrative, legal, and other remedies on behalf of" mentally ill State

residents.  *Id.* at 1162.

18

Not all courts agreed with these three district court opinions.  About six weeks after Judge Goettel issued the decision in *Trautz*, the Fifth Circuit addressed a similar question in *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994), a case involving delays in the placement of a developmentally disabled minor, Matt W.  One of the plaintiffs in that action was Advocacy, Inc., which claimed a "statutory mandate … to protect and advocate the rights of disabled individuals" under 42 U.S.C. § 6042.  *Ass'n for Retarded Citizens*, 19 F.3d at 244 & n.5.[5] Advocacy, Inc., asserted that it had "both (1) standing on behalf of itself as an organization as well as (2) representational standing on behalf of individuals with developmental disabilities." *Id.* at 243.

The district court disagreed on both counts and dismissed the organization's claims for lack of standing.  On appeal, the Fifth Circuit affirmed the district court's decision.  First, the appellate court held that because Advocacy, Inc., had "failed to establish that it … suffered an injury in fact—the first requirement under *Lujan*—it fail[ed] to establish organizational standing." *Id.* at 244.  Second, the Fifth Circuit held that Advocacy, Inc., could not establish associational standing because Matt W. was not a "member" of Advocacy, Inc.  *Id.*  The Court also implied that Advocacy, Inc., could not establish indicia of membership, stating:  "The organization bears no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts." *Id.*

---

[5] 42 U.S.C. § 6042 is the section of the Original DD Act that required the States to create P&A systems in order to receive federal funds.  Although the Fifth Circuit did not mention P&A systems, the Court's mention of § 6042 and its "statutory mandate" implies that Advocacy, Inc., was either a P&A system or affiliated with a P&A system.

In the mid-1990s, the standing issue was addressed by both the United States Senate's Labor and Human Resources Committee (the "Committee") and the federal agency responsible for implementing and administering the Original DD Act: the Administration on Developmental Disabilities, a part of the U.S. Department of Health and Human Services' Administration for Children and Families (the "Agency").  In 1994, the Committee "heard testimony about the waste of scarce resources that are expended on litigating the issue of whether P&A systems have standing to bring suit."  S. Rep. 103-120, p. 39, 1994 U.S.C.C.A.N. 164, 202–03.  However, after reviewing the issue, the Committee decided that "no statutory fix [wa]s necessary because the … statute [wa]s clear that P&A systems have standing to pursue legal remedies to ensure the protection of and advocacy for the rights of individuals with developmental disabilities within the State."  *Id.*  The Committee specifically noted that it concurred with the holdings and rationale in *Goldstein* and *Rubenstein*.  *See id.* at 39–40.

About the same time, commentators recommended that the Agency address the standing dispute by including "regulatory language … which would allow the [P&A] system to bring lawsuits in its own right to redress incidents of abuse or neglect, discrimination and other rights violations impacting on individuals with developmental disabilities."  Developmental Disabilities Program, 61 Fed. Reg. 51,142-01, 51,146.  In response, the Agency added a regulation on "Allowable Litigation Costs," which was originally codified at 45 C.F.R. § 1386.25.  That regulation provided, in part, that federal funds could be "used to pay the otherwise allowable costs incurred by a Protection and Advocacy System in bringing lawsuits in its own right to redress incidents of abuse or neglect, discrimination and other rights violations …."  45 C.F.R. § 1386.25.

Despite this regulation and the Committee's statement, circuit courts uniformly followed the Fifth Circuit's approach in deciding whether P&A systems have standing.  In 1999, the Eleventh Circuit addressed the question of whether Advocacy Center, "a federally-authorized protection and advocacy organization established under … PAMII," had "standing to challenge a state statute limiting access to mental health records on behalf of individuals with mental health disabilities." *Doe v. Stincer*, 175 F.3d 879, 881, 882 (11th Cir. 1999).  In analyzing the case, the Court reviewed "the well-established general principles governing associational or organizational standing," *id.* at 882, and quoted the statutory language from 42 U.S.C. § 10805(a)(1)(B) on which *Rubenstein* and *Goldstein* relied, *Stincer*, 175 F.3d at 883.  However, despite citing with approval the decisions in *Trautz*, *Rubenstein*, and *Goldstein*, *see Stincer*, 175 F.3d at 884, the Eleventh Circuit held that Advocacy Center had not established standing.  The Court first implied that Advocacy Center had not attempted to establish organizational standing, noting that it did "seek to establish standing based on injuries to itself." *Id.* at 883.  The Court then held that, although Advocacy Center could potentially establish associational standing despite being a non-membership organization, it had not adduced sufficient evidence to do so. *Id.* at 885–87.

In 2003, the Ninth Circuit addressed the question of whether the Oregon Advocacy Center ("OAC"), "a federally authorized and funded law office established under … PAMII," had standing to sue the Oregon State Hospital ("OSH") for "violating mentally incapacitated defendants' due process rights by unreasonably delaying such defendants' transfer from county jails to OSH for treatment." *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1105 (9th Cir. 2003). The district court had relied on the principles of associational standing to conclude that OAC had standing to represent "its constituents," and the Ninth Circuit concurred.  The Court conceded

that the constituents of OAC did not have all the indicia of membership that the Washington

apple growers and dealers possessed.  Nonetheless, they possessed "many indicia of

membership—enough to satisfy the purposes that undergird the concept of associational

standing: that the organization is sufficiently identified with and subject to the influence of those

it seeks to represent as to have a 'personal stake in the outcome of the controversy.'"  *Id.* at 1111

(quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)).

Although *Mink* did not mention *Goldstein*, *Rubenstein*, or *Trautz*, it implicitly rejected

those opinions.  The Court noted that OAC had attempted "to short-circuit OSH's standing

arguments by contending that Congress, in enacting PAMII, statutorily conferred standing on

organizations such as OAC as a matter of law."  *Mink*, 322 F.3d at 1109.  After examining the

provisions of PAMII, including 42 U.S.C. § 10805(a)(1)(B), the Ninth Circuit "accept[ed]

OAC's argument that Congress intended to confer standing to pursue suits like this one on

organizations like OAC."  *Id.* at 1110.  However, the Court stated:

> The question whenever Congress attempts to confer standing is
> whether the particular obstacle that Congress has attempted to
> remove is "constitutional and absolute, or prudential and malleable
> by Congress." *United Food*, 517 U.S. at 551 ….  OSH's standing
> challenges under the first prong of *Hunt* and under causation …
> concern standing requirements that are "constitutional and
> absolute" in nature. Thus PAMII—although relevant to the
> standing analysis—does not definitively answer the question
> whether OAC has standing.

*Id.* at 1110.

In 2007, the Eighth Circuit addressed the question of whether Missouri Protection and

Advocacy Services, Inc. ("MOPAS"), a federally funded nonprofit advocacy organization, had

standing to challenge a Missouri law that disqualified persons under court-ordered guardianship

from voting.  In deciding that MOPAS lacked standing, the Eighth Circuit principally relied on

*Ass'n for Retarded Citizens* and a district court opinion, both of which had considered whether a

non-membership organization had associational standing. *Missouri Prot. & Advoc. Servs., Inc.*

*v. Carnahan*, 499 F.3d 803, 809 (8th Cir. 2007).  The Eighth Circuit concluded that the

MOPAS's "constituents, like the constituent of the Association for Retarded Citizens of Dallas,

lack[ed] the 'indicia of membership' necessary to satisfy the first prong of *Hunt*." *Carnahan*,

499 F.3d at 810.

In 2012, the Second Circuit considered the question of whether DAI, then still a

contractor to New York State's P&A system, had "standing to sue various state agencies and

officials on behalf of certain individuals with mental illness residing in New York City." *DAI*,

675 F.3d at 152.  The district court, relying in part on *Trautz*, held that DAI had standing. *DAI v.*

*Paterson*, 598 F. Supp. 2d 289, 307–10 (E.D.N.Y. 2009).  But the Second Circuit reversed the

district court, holding that there was "no evidence that the individuals with mental illness on

behalf of whom DAI brought this case have anything approaching the indicia of membership that

is required under *Hunt*," and that DAI had therefore "failed to satisfy the constitutional

requirements for associational standing prescribed by the Supreme Court in *Hunt* and its

progeny." *DAI*, 675 F.3d at 159.

In analyzing whether DAI had standing, the Second Circuit drew a distinction between

P&A systems and contractors.  The Court noted that PAIMI contained governance requirements

for P&A systems to "ensure that they are responsive to the needs of the community they were

created to represent." *Id.* at 157; *see* 42 U.S.C. §§ 10805(a)(6)(B–C), 10805(c)(1)(B).  The

Court further noted that PAIMI "requires that P & A systems establish a grievance procedure for

clients or prospective clients to 'assure that individuals with mental illness have full access to the

services of the system.'" *DAI*, 675 F.3d at 158 (quoting 42 U.S.C. § 10805(a)(9)).  Citing to the

Fifth, Eighth, Ninth, and Eleventh Circuit opinions discussed above, the Second Circuit observed that some, but not all, courts of appeals had concluded that these statutory provisions were "sufficient to connote the 'indicia of membership' required for associational standing under *Hunt*." *Id.* However, the Second Circuit expressly declined to "decide which of [the] circuits has the better of this argument, because DAI [was then] not a P & A system but a contractor to the system." *Id.* The Court stated: "This distinction is critical to the question of whether DAI has associational standing because the sole basis cited in both *Stincer* (Eleventh Circuit) and *Mink* (Ninth Circuit) for finding that P & A systems have associational standing to sue on behalf of individuals with mental illness is that § 10805 affords individuals with mental illness (and their families and representatives) the requisite 'indicia of membership' in the administration of the system." *Id.*

The Second Circuit did not hold that DAI's constituents lacked "indicia of membership," only that DAI had "failed to satisfy its burden of establishing the elements of its purported associational standing." *Id.* at 159. The Court emphasized that DAI did "not claim that its constituents ha[d] a sufficiently active affiliation with the organization" to establish associational standing under *Hunt*. *DAI*, 675 F.3d at 158. As a result, there was "scant evidence in the record that the individuals with mental illness whom DAI purports to represent have the power to elect its directors, make budget decisions, or influence DAI's activities or litigation strategies." *Id.* at 158–59. In addition, there was no evidence "that DAI ever notified its 'constituents' or any of their legal guardians that it was filing this suit purportedly on their behalf." *Id.* at 159.

The Second Circuit distinguished district court cases cited by DAI "for the proposition that contractors have associational standing to sue on behalf of individuals with mental illness," finding them "inapposite in one of two ways." *Id.* at 159. First, the Court noted that some cases,

like *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706
F. Supp. 2d 266, 281–83 (D.Conn. 2010), actually "concerned P & A systems rather than P & A
contractors such as DAI." *DAI*, 675 F.3d at 159.  Second, the Court stated that cases like
*Rubenstein*, "that have recognized the distinction between systems and contractors of systems …
elided the constitutional dimensions of associational standing entirely," and were "therefore of
little value to DAI" in a case which turned "entirely on whether DAI meets the constitutional
threshold for associational standing set forth by the Supreme Court." *Id.*

E. The R&R

The R&R discussed the five circuit court opinions described in the preceding section, and
noted the split in authority regarding whether the statutory provisions relating to P&A systems
alone were sufficient to permit a court to find that a P&A system had associational standing.
(R&R at 13.)  Judge Bulsara opined that "DRNY had a straightforward avenue to demonstrate
standing: address the question left open in *DAI*, *i.e.*, whether a P&A system has associational
standing."  (R&R at 14.)  However, he noted:  "DRNY has chosen not to follow this path. It has
disavowed it and any attempt to show that it has associational standing."  (*Id.*)

Judge Bulsara considered DRNY's decision not to assert associational standing a
"complete mystery" in light of the "legion" of cases "that hold that a P&A system like DRNY
has associational standing." (*Id.* at 15.)  The R&R provided examples of four such cases, (*id.* at
15–16), then stated:

> Not only does DRNY not cite any of these cases, but it disavows
> them by disclaiming any reliance on—or desire to establish—
> associational standing.  Of course, for this Court to determine that
> DRNY has associational standing, DRNY would have to satisfy
> the three elements of *Hunt*. Perhaps unwilling or unable to make
> that showing, DRNY has resorted to a different standing doctrine.

(*Id.* at 16.)

25

Judge Bulsara then considered and rejected DRNY's "representational standing" theory "that Congress may confer standing upon any entity or organization via statute." (*Id.* at 16.) The R&R asserted that representational standing was a "standing doctrine … of DRNY's own creation that has no support in any caselaw—Supreme Court or otherwise—and has never been applied to a P&A system." (*Id.* at 16.) Although the doctrine of representational standing has in fact been recognized by the Supreme Court, *see United Food,* 517 U.S. at 557, the R&R correctly observed that *United Food* did not introduce a "non-associational version" of standing that permitted "Congress to simply confer standing upon an organization." (R&R at 18.) The R&R also correctly noted that no circuit court has adopted the theory propounded by DRNY in a case involving P&A systems and/or their contractors and that all circuit courts have analyzed such cases "in terms of associational standing." (*Id.* at 18.)

F. <u>DRNY's Objections</u>

DRNY timely objected to two portions of the R&R. First, DRNY asserts that Judge Bulsara "erred by concluding that DRNY disavowed associational standing simply because it chose to not assert it" in this case. (Objections at 8.) DRNY argues that, although it has "made clear that it is not bringing [an associational standing] claim here," it has not "disavowed its ability to bring a claim on behalf of people with disabilities under a theory of associational standing." (*Id.*)

Second, DRNY argues that Judge Bulsara erred "by finding that DRNY did not have representational standing pursuant to specific congressional authorization." (*Id.* at 3.) Citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979), DRNY states that "the Supreme Court has specifically recognized that Congress may, by legislation, expand standing to the full extent permitted by Art. III … thus permitting litigation by those asserting the legal interest of

26

their parties rather than their own." (Objections at 4 (internal quotation marks and citation omitted).) DRNY then offers examples of legislation in which Congress has created a right of action and granted standing to specific parties: Title VII of the Civil Rights Act of 1964, which expressly authorizes the Equal Employment Opportunity Commission to sue for back pay on behalf of employees who are victims of employment discrimination and authorizes the Attorney General to initiate civil actions against private employers, 42 U.S.C. § 2000e-5(f)(1); the Fair Labor Standards Act of 1938, which authorizes the Secretary of Labor to sue for the recovery of unpaid minimum wages and overtime compensation, 29 U.S.C. § 216(c); the Fair Housing Act, which authorizes public or private nonprofit organizations or institutions to enforce the right granted by Act though appropriate judicial or administrative proceedings, 42 U.S.C. § 3616a(a)(1); the Employee Retirement Income Security Act, which authorizes the Secretary of Labor to bring various civil enforcement actions, 29 U.S.C. § 1132(a)(2); and 15 U.S.C. § 15c, which authorizes state attorneys general to bring a federal action on behalf of the state's citizens for violations of certain federal antitrust laws.

DRNY analogizes these statutes to the DD and PAIMI Acts, which authorize P&A systems, like DRNY, to bring claims on behalf of people with disabilities. (Objections at 5–6.) First, DRNY cites to 42 U.S.C. § 15044(b)(1), which states, in pertinent part, that "[n]othing in … [the DD Act] shall preclude a system from bringing a suit on behalf of individuals with developmental disabilities against a State, or an agency or instrumentality of a State." Second, DRNY cites to two provisions of the PAIMI Act: 42 U.S.C. § 10805(a)(1)(B), which authorizes a P&A system to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State,"

and 42 U.S.C. § 10805(a)(1)(C), which authorizes a P&A system to pursue certain administrative, legal, and other remedies on behalf of mentally ill individuals.

DRNY also cites four cases in support of this argument: *Goldstein*, *Rubenstein*, *Trautz*, and *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247 (2011). DRNY correctly notes that the first three of these cases support that proposition that the DD and PAIMI Acts grant a P&A system or its contractor standing to sue even absent a showing of injury-in-fact. (*See* Objections at 7.) However, the Objections do not address the question of whether these decisions were implicitly overruled by the Second Circuit's subsequent decision in *DAI*. DRNY cites the fourth case solely for the proposition that:

> The [DD and PAIMI] Acts require that a P & A system have authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of" its charges. § 15043(a)(2)(A)(i); see § 10805(a)(1)(B). And in addition to pressing its own rights, a P & A system may "pursue administrative, legal, and other remedies on behalf of" those it protects. § 10805(a)(1)(C); see § 15044(b).

*Virginia Off. for Prot. & Advoc.*, 563 U.S. at 251. DRNY does not cite to any portion of that opinion that specifically addressed standing.

G. <u>De Novo Analysis of the Objections</u>

The first of DRNY's two objections is premised on a misreading of the R&R. Judge Bulsara did not state that DRNY "disavowed associational standing," as DRNY claims. (Objections at 8.) First, Judge Bulsara noted that DRNY had disavowed "a straightforward avenue to demonstrate standing: address the question left open in *DAI*, *i.e.*, whether a P&A system has associational standing." (R&R at 14.) Second, he stated that DRNY had disavowed "any attempt to show that it has associational standing." (*Id.*) Third, Judge Bulsara observed

28

that DRNY had not cited and disavowed certain cases which held "that a P&A system like DRNY has associational standing."  (R&R at 15.)

The Court does not read the R&R as stating or implying that DRNY "disavowed its *ability* to bring a claim on behalf of people with disabilities under a theory of associational standing."  (Objections at 8 (emphasis added).)  To the contrary, the R&R states that DRNY is "disclaiming any reliance on—or desire to establish—associational standing" in this particular case.  (R&R at 15.)  DRNY concedes that this statement is entirely correct.  (Objections at 8.) ("DRNY has made clear that it is not bringing [an associational standing] claim here.")

DRNY's second objection is premised on the theory that Congress has granted P&A systems standing to sue even absent a showing of injury-in-fact.  (*See* Objections at 7.)  It is beyond dispute that "Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one 'who otherwise would be barred by prudential standing rules.'"  *Gladstone Realtors*, 441 U.S. at 100 (quoting *Warth*, 422 U.S. at 501).  Indeed, DRNY provides five examples of legislation in which Congress has done so.

Although DRNY's objection correctly quotes *Gladstone Realtors*, (Objections at 4), DRNY omits the remainder of the paragraph in which that quote appears.  That language clarifies that "[i]n no event, … may Congress abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,' … that is likely to be redressed if the requested relief is granted."  *Gladstone Realtors*, 441 U.S. at 100 (quoting *Warth*, 422 U.S. at 501).  Thus, "some injury-in-fact must be shown to satisfy constitutional requirements, for Congress cannot waive the constitutional minimum of injury-in-fact."  *United States ex rel. Kreindler & Kreindler*, 985 F.2d at 1154.

29

To be sure, the district courts cases cited in DRNY's objection appear to hold the contrary: that a P&A system need not show an injury-in-fact. *Goldstein* held that, in light of the legislative purpose behind the Original DD Act and the responsibilities that P&A systems had under the statute, a P&A system "need show no injury to itself in order to have standing" to sue under the Original DD Act. *Goldstein*, 83 F.R.D. at 614 (W.D.N.Y. 1979). *Rubenstein* essentially adopted the reasoning of *Goldstein*, holding that DAI had standing to sue "[g]iven the broad remedial purposes of the Act, and the statutory language apparently conferring a right upon entities such as DAI to pursue legal remedies such as those sought …." *Rubenstein,* 790 F. Supp. at 408. And *Trautz*, relying on *Goldstein* and *Rubenstein*, also accepted the argument that DAI, then a contractor to New York's P&A system, had standing solely by virtue of the PAIMI Act's statutory authorization to "pursue administrative, legal, and other appropriate remedies to ensure the protection of mentally ill individuals who are receiving care or treatment in the State." *Trautz*, 846 F. Supp. at 1160.

However, the circuit courts that have considered the standing question since the mid-1990s, when these three district court cases were decided, have implicitly rejected their approach. None has held that statutory authorization to litigate on behalf of disabled persons is alone sufficient to give P&A systems standing. Rather, these Courts have uniformly considered the question of whether the P&A systems' constituents had sufficient "indicia of membership" to satisfy the constitutional, injury-in-fact requirement of the first prong of *Hunt*.

Two of the Circuit Courts have specifically rejected the theory espoused in the three district court cases. In *Mink*, the Ninth Circuit accepted the proposition that "Congress intended to confer standing to pursue suits like this one on [P&A] organizations like OAC," but rejected

the assertion "that Congress, in enacting PAMII, statutorily conferred standing on organizations

such as OAC as a matter of law." *Mink*, 322 F.3d at 1109, 1110.  The Court stated:

> The question whenever Congress attempts to confer standing is
> whether the particular obstacle that Congress has attempted to
> remove is "constitutional and absolute, or prudential and malleable
> by Congress." *United Food*, 517 U.S. at 551 ….  OSH's standing
> challenges under the first prong of *Hunt* and under causation …
> concern standing requirements that are "constitutional and
> absolute" in nature. Thus PAMII—although relevant to the
> standing analysis—does not definitively answer the question
> whether OAC has standing.

*Id.* at 1110.

While *Mink* did not mention any of the three district court cases by name, the Second

Circuit expressly stated that *Rubenstein* was of "little value" to DAI, then a P&A contractor, in

its attempt to establish standing in *DAI*.  The Court noted that *Rubenstein* "elided the

constitutional dimensions of associational standing entirely," and was "therefore of little value to

DAI" in that case, which turned entirely on whether DAI met "the constitutional threshold for

associational standing set forth by the Supreme Court."  *Id.*

*Goldstein*, *Rubenstein*, and *Trautz* are of equally little value to DRNY in this case.  As

discussed above, "[a]n organization can have standing to sue in one of two ways."  *New York*

*Civil Liberties Union*, 684 F.3d at 294.  The organization can either allege "organizational"

standing—*i.e.*, "standing … to seek judicial relief from injury to itself and to vindicate whatever

rights and immunities the association itself may enjoy," *Warth*, 422 U.S. at 511—or

"associational" or "representational" standing—*i.e.*, standing to "redress its members' injuries,"

*United Food,* 517 U.S. at 552.  DRNY has not argued that it has organizational standing, but

rather contends that it has representational standing.  (Objections at 4.)

31

In order to make out standing under this theory, an organization must establish "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. The first two requirements are "grounded on Article III as an element of 'the constitutional requirement of a case or controversy.'" *United Food*, 517 U.S. at 554–55 (quoting *Warth*, 422 U.S. at 511). Only the third requirement is a prudential requirement "that may be abrogated by Congress." *DAI*, 675 F.3d at 157. Accordingly, although the Court agrees with DRNY that Congress may have intended to confer standing to pursue suits like this one on P&A systems, that Congressional intent alone does not suffice to establish standing. *See Mink*, 322 F.3d at 1110.

In order to satisfy *Hunt*'s first prong, a non-membership organization like DRNY must establish that it "functioned effectively as a membership organization." *In re Holocaust Victim Assets Litig.*, 225 F.3d at 196. To do so, a non-membership organization must show that its constituents "possess[ed] all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. As Judge Bulsara correctly noted in his R&R, P&A systems have successfully made that showing. R&R at 15–16 (citing cases); *see Mink*, 322 F.3d at 1110–12; *Stincer*, 175 F.3d at 886. But DRNY has expressly declined to do so. Accordingly, Judge Bulsara was correct in concluding that the DRNY had failed to satisfy its burden of establishing standing.

**CONCLUSION**

Having reviewed de novo those portions of the R&R to which DRNY objects, and having found those objections to be without merit, the Court accepts the recommendations in Judge

Bulsara's R&R.   Plaintiff DRNY is dismissed as a party to this action without prejudice for lack of standing.

SO ORDERED.

Dated:  Brooklyn, New York
        December 28, 2023

*__Roslynn R. Mauskopf__*
ROSLYNN R. MAUSKOPF
United States District Judge